## NATIONAL LABOR RELATIONS BOARD v. CLINTON WOOLEN MFG. CO. (CLINTON WOOLEN WORKERS, Intervenor).

### No. 9632.

Circuit Court of Appeals, Sixth Circuit.

April 7, 1944.

754

Bernard L. Alpert, of Washington, D. C. (Robert B. Watts, Howard Lichtenstein, Joseph B. Robison, and Mozart G. Ratner, all of Washington, D. C., on the brief), for petitioner.

James H. Spencer, of Detroit, Mich. (Renville Wheat and James H. Spencer, both of Detroit, Mich., on the brief), for respondent.

L. B. Kuney, of Adrian, Mich., for intervenor Clinton Woolen Workers.

Before HICKS, SIMONS, and McALLISTER, Circuit Judges.

SIMONS, Circuit Judge.

In the little town of Clinton, in Southeastern Michigan, the respondent operates a woolen mill where it employs 230 of the town's 1200 inhabitants, including many family groups. Although the plant was started in 1866 there was no union activity until late in 1941, when almost concurrent effort at unionization began in behalf both of an independent union and of the Textile Workers Union of America, a C. I. O. affiliate. A contract between the respondent and the intervenor having resulted, complaint followed that the intervenor was organized through respondent's interference with the choice of its employees, and was dominated by it. The National Labor Relations Board after the usual hearing and upon findings of unfair labor practices, issued its order directing the respondent to cease and desist from such domination, from recognizing the intervenor as representing its employees and from giving effect to its contract with it. This order the Board now seeks to have enforced.

There is completely absent, upon this record, the usual history of employer hostility to unionization. The inspiration for the organization of the intervenor came from Mahrle, an employee who began talking of it a year earlier but did nothing until August, 1941. He had been a fishing and hunting companion of Preston, president of an independent union in a plant at Tecumseh, five miles from Clinton. Sometime before Labor Day Mahrle was taken by Preston to consult Kuney, attorney for the Tecumseh union, and before anyone appeared in Clinton on behalf of the T. W. U. A., had obtained and started to circulate petitions for an independent union. Some of the respondent's employees were receptive because they had worked for the Tecumseh Products Com-

pany and had been members of the independent union at its plant.

On September 6, 1941, Bahr, as representative of the T. W. U. A., distributed handbills at the respondent's gates, calling a meeting for Sunday, September 7, at the village schoolhouse. It was announced as a general public meeting and attendance was not limited to employees of the company. Upon learning of the call, the respondent instructed its supervisory employees not to attend. However, at the meeting on Sunday, among the 100 people present were White, a minor supervisory employee, and Kimball, secretary of the company. The meeting was addressed by Bahr who advised those present of their right to organize and join a union of their own choosing without fear of discharge, and informed them that the T. W. U. A. had come to Clinton to organize the plant and improve working conditions there. In the question and answer period which followed, White volunteered that the employees did not need the C. I. O. or any outside labor organization, but could form a union of their own and that they could get a lot more out of the mill now that the C. I. O. had come into Clinton. When solicitation for membership began by the distribution of applications, White left the meeting. Kimball, who had taken no part in the discussion, also left.

The following day, September 8, Bahr called at the plant and asked Nilsen, its General Manager, to post a notice on the bulletin board citing sections of the National Labor Relations Act and advising the workers that they had a right to join a union of their own choosing without interference from any source. Nilsen then read to Bahr a notice that the company had already prepared, instructing all supervisory employees that they were not eligible for union membership, that they were to take a neutral stand upon the issue, and were not to advise any employee whether he should or should not join any union. This notice, printed in full in the margin,[1] was, on the same day, given to 30 foremen and supervisory employees, including those having the status of White. The notice was not posted but the Board found that its contents became a matter of common knowledge through the plant.

On Tuesday, September 9, Mahrle, together with Ogden, later president of the intervenor, and Philo, who became one of its directors, requested Nilsen to close the plant that evening so that the employees could hold a union meeting. Nilsen refused, asserted that the plant would remain open, and immediately thereafter instructed foremen and supervisory employees not to allow solicitation at the plant, to keep the plant running, and require any who left to "ring out." The instructions, as far as possible, were observed. Notwithstanding, all but 12 or 15 of the 80 or 90 employees on the shift that evening, left the plant. Ogden undertook to persuade the Chief Engineer to shut down the power, but failed. He testified, "We asked him what would happen if we pulled the switch. He said somebody would get a sock in the nose. And he isn't a man to be trifled with."

The meeting for the formation of an independent union was held that night in the schoolhouse. No supervisory employees participated. Mahrle introduced Kuney who took charge. An organization was perfected and a Board of Directors elected who were authorized to sign articles of incorporation. The following day Ogden delivered a letter to Nilsen advising him that the Independent represented a majority of employees and making demands in their behalf including recognition of the union as exclusive bargaining agent. Nilsen, on the following day, responded, informing Ogden that he would discuss matters with the union as soon as a meeting could be arranged, and setting Sunday, September 14, as the time. On that day three representatives of the company met with the directors of the intervenor and its attorney. The union presented cards signed by employees authorizing it to act as bargaining agent, and while Nilsen

---

[1] "Within the last few days it has come to our attention that attempts are being made to unionize this plant.

"In view of the current efforts along this line, the company feels that it should clarify its position. The company must and does remain strictly impartial to any attempts at unionization. We do not take a stand for or against such efforts.

"As a supervisor, you are a representative of the company, and, as we understand, you are not eligible for union membership. We are, therefore, advising you to take a neutral stand on this issue. You are not to advise any employee whether he should or should not join any union.

"If these instructions are not clear, see us at once."

made no actual count of the cards, relying merely upon a spot-check, it is undisputed that the cards represented a majority of the respondent's employees. Respondent thereupon agreed to recognize the intervenor and proceeded to a discussion of its demands. Kuney had prepared a proposed contract, some provisions of which were accepted and others rejected, with Kuney designated to prepare the final draft. It was agreed that the contract would not be executed until ratified by a full meeting of the union membership. This meeting was called for the following Tuesday, and the plant was closed in the afternoon so as to take one-half hour from each shift, though employees were not paid for the time lost. At that meeting the contract was ratified and subsequently was signed both by the intervenor and the company. It provided, among other things, for a closed shop, a check-off, and a 10% increase in wages. In August, 1942, the contract was renewed with additional concessions to the union. Meanwhile, in February, 1942, the intervenor expelled seven of the respondent's employees for joining the T. W. U. A. in pursuance of a provision in its by-laws prohibiting membership in another union, and demanded their dismissal by the respondent. Conforming to the closed shop clause in its contract, the respondent complied. The Board has now ordered that the discharged employees be reinstated with back pay.

■ The sole question of law in the case is whether the Board's findings of interference, coercion, and domination, are supported by substantial evidence so as to give validity to its order. The circumstances mainly relied upon by the Board are the presence of Kimball and White at the first T. W. U. A. meeting, and White's observations at the time, the respondent's failure to disavow White as its spokesman by the posting of a notice, its failure to discipline employees for the walkout, its shutdown for the meeting to ratify the contract, its hasty recognition of the intervenor and the speed with which an agreement with it was reached, its ready acceptance of a closed shop and check-off, and its failure to discipline the officers of the intervenor for taking employees off the job to question them concerning C. I. O. activities. It is out of such threads of evidence that the finding of interference, coercion and domination is woven. The walkout, for the purpose of holding an organizational meeting, was not only without consent of the respondent but in violation of its express instructions to remain. It is urged that by failing to discipline its employees for leaving the plant, the respondent engaged in an unfair labor practice. But discrimination against employees for union activity is condemned by the Act, a walkout is, in practical aspect, a strike, and strikers may not be discharged for exercising their inherent right to strike. N. L. R. B. v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S. Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599. That which would have been a violation of law for the respondent to do, is now urged as the thing it should have done, and its failure to do it is declared to be an unfair labor practice. We are unable to agree.

■ The second meeting of the union was held during working hours though not on company premises or company time. But the intervenor was now the recognized representative of the respondent's employees with membership concededly including a majority of all persons in the plant. There is no demonstration of purpose in the shut-down to enable the intervenor to "get its lines in order" so as to combat the inroads of a challenger, as in N. L. R. B. v. Electric Vacuum Cleaner Co., 315 U.S. 685, 62 S.Ct. 846, 86 L.Ed. 1120. The union was already organized, represented a majority of employees, and a contract was to be submitted for ratification. It is conceded by the Examiner, that the success of the intervenor in organization, speedy bargaining, securing a contract and recognition, do not alone establish interference and domination since threat of competition is a spur to action.

■ Much is made, however, of the fact that the company, without delay, consented to the closed shop and the check-off. Prompt surrender of this last bastion of employer defense against union demands, is pressed upon us as evidence of interference with freedom of choice, so as to sustain a finding of domination and coercion. The statute commands collective bargaining, and refusal to bargain is an unfair labor practice. The purpose to be served is avoidance of labor controversy. It is curious doctrine that condemns compliance with law in conformity with its high purpose as a violation of law, and exalts reluctance to yield to labor demands at the risk of creating or continuing labor strife, to virtue incompatible with unfair labor practice. It must be remem-

bered that at the time of the signing of a contract, the great Ford Motor Company, in the immediate neighborhood, had just granted a closed shop contract to its employees after an embittered controversy that raged for years in the press and through the courts, with repeated assertions that Ford would never yield to union labor and that many other great plants in the Detroit area had signed closed shop contracts. The little plant in Clinton could not reasonably be expected to breast the tide of management's concession to labor, and its failure to do so is not to be construed as substantial evidence supporting findings of unfair labor practices.

There is left as support for the Board's findings, the happenings at the first T. W. U. A. meeting—Kimball's attendance for a brief period, and White's observations as to the lack of need for an affiliated union. The presence of Kimball on this record is innocuous. He took no part in the deliberations, left as soon as organization was begun, and many of the Board's witnesses were unaware of his presence. The meeting was advertised as a public meeting, and there is evidence that those attending were not in any way intimidated or coerced by Kimball's presence. White was not a foreman. He was a "fixer" in the Dressing and Spooling Department of the respondent, on an hourly wage. His only supervisory duties were to see that instructions in the department were carried out in the absence of the foreman. He had no authority to hire or fire. He attended the meeting because he assumed he was eligible to membership in the union. He was among those who were subsequently notified by the company of its neutral attitude, and his gratuitous support of an independent union, ended with his remarks at the meeting, to which reference has been made, and no further activity by him is recorded. There are well-reasoned cases which hold that employers are not responsible for acts of minor supervisory employees of the status of White. Ballston-Stillwater Knitting Co. v. N. L. R. B., 2 Cir., 98 F.2d 758, especially when their activities are sporadic and do not reflect the attitude of the employer otherwise indicated. Humble Oil & Refining Co. v. N.L.R.B., 5 Cir., 113 F.2d 85, 92. The language of the last-cited case is pertinent—"It would be strange indeed if a labor organization, freely organized by a large majority of the employees, is to be destroyed whenever some well-wishing supervisor, contrary to his own duty and orders, says something in. its favor." We are well aware that the test whether a challenged organization is employer controlled is not an objective one but rather subjective from the standpoint of employees, N. L. R. B. v. Thompson Products Co., 6 Cir., 130 F.2d 363, and that "Where the employees would have just cause to believe that solicitors professedly for a labor organization were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates." International Association of Machinists v. N. L. R. B., 311 U.S. 72, 61 S.Ct. 83, 88, 85 L.Ed. 50. It is true that the lack of authority to hire and fire, or the fact that an employee is not high in the factory hierarchy, does not always free the employer of responsibility for his interference, and this may be true even in respect to employees having no supervisory authority at all, but the cases that so hold, such as International Association of Machinists v. N. L. R. B., supra, have found interference to exist when apparently condoned by the employer or when against a background of employer hostility to unionization or continued discrimination in tasks assigned, as in Consumers Power Co. v. N. L. R. B., 6 Cir., 113 F.2d 38, or where an employer had concededly established and dominated a company union and the question before the Board was whether it had successfully disestablished it, for in such cases as N. L. R. B. v. Falk Corp., 308 U.S. 543, 60 S.Ct. 307, 84 L.Ed. 396, the inference is strong that the establishment of a second internal union is not a mere coincidence and requires proof of strong measures taken to free employees from consciousness of a domination previously existing.[2]

---

[2] The reasonableness and validity of the inferences drawn by the Board, in Virginia Electric Co. v. N. L. R. B., 319 U. S. 533, 542, 63 S.Ct. 1214, 87 L.Ed. 1568, were based upon findings of specific management interference with the formation of an independent union prior to the execution of the contract. The celerity of agreement in the bargaining conference, to a closed shop and check-off, were held to justify a conclusion that because of the independent's origin the employees were "not as free as the statute requires." Such background is not in evidence in the present case.

Interference, coercion, and domination are active processes. They may, of course, be inferred from a course of conduct even though no overt acts are proved, and inferences are for the Board to draw and not for us. The Board must be, as always it has been, upon its guard against subtle evasions by which attitudes, fair on their face, realistically viewed, amount to interference and coercion. But a finding of domination based on a single observation of an employee having negligible supervisory powers, unaccompanied by employer hostility to unionization otherwise demonstrated, an observation not coupled with coercive threats, and promptly repudiated by management in general instructions to supervisors and foremen, an observation not repeated, and supported by no proof of its coercive effect except by vague and unsupported hearsay, has not, in any case cited to us, been held to be supported by substantial evidence.

The discharge of employees was in violation of law only if the intervenor was, because of unfair labor practices, an illegally established union, illegally recognized. Not finding it to be such, the affirmative provisions of the Board's order need not be considered.

The Board's petition is denied.