## NATIONAL LABOR RELATIONS BOARD v. MT. CLEMENS POTTERY CO.

### No. 9710.

Circuit Court of Appeals, Sixth Circuit.

Feb. 13, 1945.

Joseph B. Robison, of Washington, D. C. (Alvin J. Rockwell, Malcolm F. Halliday, and David Findling, all of Washington, D. C., and Herman Lazarus, of Philadelphia, Pa., on the brief), for petitioner.

Bert V. Nunnelcy, of Mt. Clemens, Mich., and Percy J. Donovan, of Detroit, Mich., for respondent and intervenor.

Beaumont, Smith & Harris, Albert E. Meder, and Percy J. Donovan, all of Detroit, Mich., and Bert V. Nunnelcy, of Mt. Clemens, Mich., on the brief, for respondent.

Kenneth J. Logan and Maxton R. Valois, both of River Rouge, Mich., on the brief, for intervenor.

Before SIMONS, HAMILTON, and McALLISTER, Circuit Judges.

SIMONS, Circuit Judge.

The respondent is engaged in the manufacture of dinnerware at Mt. Clemens, Michigan, with approximately 750 employees. In August, 1940, the United Pottery Workers, a labor organization affiliated with the C.I.O., initiated a campaign to organize its employees and obtained some members. An affiliate of the A.F. of L. likewise undertook to organize the plant, but met with little response and is not in the present controversy. On October 3 and 4, Doll, president of respondent, held meetings of all of its employees and read to them a prepared statement to the effect that they would be better off if they did not join the union, without specifying

which union was meant. About this time Harms, a foreman, inquired of some of the workers whether Lillian Socia, a C.I.O. member, had been talking for the Union in the plant, and late in January, told Burgess, an employee who had attended a C. I.O. meeting, that the employees had always got along without an outside organization. In February, 1941, Doll posted a notice stating that wages and other questions of employment were matters to be adjusted strictly between employer and employee, that any statement that a worker would have to join a union to hold his job, was false, and requesting employees to report instances of coercion or intimidation, although there is no proof that such threats had been made.

In April, 1941, when the first strike occurred, Copeland, another foreman, was asked by an employee what the respondent would do with the hand dippers who were being replaced by new machines, and replied, "If they don't stop bringing in the union we will have a lot more machines in." Two foremen called upon the employee Dupont and intimated to him that there were good promotional jobs open, and foreman Randolph asked a picket why he didn't take his problems to Doll instead of airing them with "those fellows in Detroit." Likewise during the strike the respondent sent letters to its employees stating "it would be futile to resume operations except under conditions that will make impossible a repetition of Monday's walkout or any other suspension of operations." A ballot was enclosed on which the workers were asked to indicate whether they approved of the strike or whether they wanted to return to work, but the ballots were never opened. Upon the basis of these circumstances, established by evidence credited by the Board, the Board found that the respondent had "interfered with, restrained, and coerced" its employees in violation of § 8(1) of the National Labor Relations Act, 29 U.S.C.A. § 158(1) and issued a cease and desist order with affirmative directives for which it now seeks enforcement.

■ We are not presented with any issue in respect to the right of the employer to freely express his views on unionization of his employees, as in National Labor Relations Board v. Ford Motor Co., 6 Cir., 114 F.2d 905, 914, and Midland Steel Products Co. v. National Labor Relations Board, 6 Cir., 113 F.2d 800, and have no

occasion to apply the doctrine of Thornhill v. State of Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 84 L.Ed. 1093, or American Federation of Labor v. Swing, 312 U.S. 321, 325, 61 S.Ct. 568, 85 L.Ed. 855, for the reason that the Board made no finding that Doll's expression of his views on unionization was an unfair labor practice on the part of the respondent, nor is he restrained from expressing his opinions by the terms of the cease and desist order. Such views, however, become important in determining whether employees have reasonable ground to believe that supervisors, in discouraging unionization or interfering in any way with their free choice of a bargaining agency, represent the views of management. The test is not objective, but subjective, from the standpoint of employees. National Labor Relations Board v. Thompson Products, 6 Cir., 130 Fed.2d 363, 368.

■ While some of the incidents might to us seem unimportant and as having little coercive effect upon the free choice of the employees, there was room for an inference that the respondent had unlawfully interfered with their organizational activities. Certainly the statement of Copeland that if unionization persisted more hand dippers would be replaced by machines, was coercive. It could reasonably be inferred that the proposal to put Dupont into a better job was to discourage his activity in the union, and that there was implicit a threat to suspend operations in Doll's letter to the workers during the strike. Such inferences are for the Board and not for the court, as we have recently observed in National Labor Relations Board v. American Creosoting Co., Inc., 139 F.2d 193, where controlling authority is fully cited. We are compelled to sustain the findings of the Board that the respondent had interfered with, restrained, and coerced its employees in violation of § 8 (1), and to sustain its order requiring it to cease and desist from such practices.

The Board also found that the respondent was instrumental in the formation of the Pottery Workers Co-operative, an unaffiliated labor organization of its employees with which it had bargained and now has a contract. The order requires it to cease dominating or interfering with the Co-operative, recognizing it as the representative of its employees, or giving effect to its contract, and directs that it withdraw recognition from and disestablish the Co-operative as such representative.

The Board found that late in February or early in March, 1941, while organization efforts were being pursued by the United, a suggestion for an inside union was made to some of the respondent's employees by its foreman Parrott, and that thereafter, on April 11, two employees in the clay department, undertook to circulate petitions to that end among the employees for the purpose of forming a shop union to bargain collectively with management. They took time off for that purpose. Within half an hour thereafter their activities came to the attention of Doll who then had them collect all of the petitions and destroy them in his presence. Meanwhile, an entirely separate organization was started which became the Co-operative. There is no evidence that those who started it were in any way under company control. Some assistance was, however, given to it by the son of the plant superintendent, and Crothers, a foreman, attended an organizational meeting, though he took no part. The next day, however, Crothers gave orders that no more cards were to be passed out in the plant because Doll had said it was against the law. However, on April 14, the day the first strike started, an employee, Sopha, at the home of his foreman Fitton, was given a Co-operative application by Fitton's sister-in-law. Organization proceeded rapidly during the strike, and on April 18, Reese, the Co-operative's attorney, wrote to Doll claiming a majority, requesting a meeting of all parties, and a consent election. Doll had previously refused to meet the C.I.O. representatives, but he now met with representatives of both Unions at the office of a state labor conciliator. During the meeting the C.I.O. director claimed a majority of respondent's employees, but made no offer of proof and refused to consent to any election to which the Co-operative was a party. The Co-operative's lawyer then demanded a check of the Co-operative's membership cards by an impartial umpire. That check was made on May 1 and 2, with a report that the Co-operative had 58% of the employees. The respondent thereupon opened bargaining negotiations with the Co-operative on May 5, and on May 7 a contract was signed. On November 24 the C.I.O. called another strike, but the plant remained open. The night before the strike some 25 or 35 employees, members of the

Co-operative, stayed all night in the plant with foremen and officials, and in the morning tried to break the picket line which blocked the entrances, and a fight resulted. During the strike Starner, a foreman, told a striker that he had helped him get his job and that in striking he had put Starner in bad with Doll, and praised the Co-operative.

From these circumstances the Board concluded that the respondent dominated and interfered with the formation and administration of the shop union in violation of § 8(2) of the Act. Were it possible for us to put into a separate compartment the circumstances relied upon to establish promotion and domination of the Co-operative by the respondent, and to insulate them from the unfair labor practices heretofore discussed, it would be difficult to perceive that such circumstances, even though credited by the Board, rise to the dignity of substantial evidence disclosing domination. While Parrott, a foreman, had told an employee, Willey, that the C.I.O. was getting pretty strong and had asked him if he was doing anything to protect his job, no threat was involved, and Willey joined the C.I.O. without being discriminated against. While Odor and Woodarski, who first circulated petitions for a shop union, were not disciplined by the respondent, as a C.I.O. member previously had been, and this was found to be evidence of partiality, yet the C.I.O. member had been carrying on his activities in the plant upon company time, while the others had been active on their own time. There is no contention that those who started the movement which resulted in the formation of the Co-operative, were in any way under company control, and there was no finding that the activity of Pat Rouleau, son of the plant superintendent, could be imputed to the superintendent himself, or was considered by any employee to represent the superintendent's views. Nor does the fact that the respondent promptly bargained and concluded a contract with the Co-operative, constitute evidence that it promoted and dominated the Co-operative. Being advised by the result of an impartial check that the shop union had enlisted 58% of its employees, the respondent acted in compliance with, rather than in evasion of, law, when it bargained and entered upon a contract with the Co-operative.

266

■ But the charge of domination cannot be insulated from unfair labor practices held to have interfered with the organizational activities of employees, either concurrently, prior to, or subsequent to organizational efforts. It was said in International Association of Machinists et al. v. National Labor Relations Board, 311 U.S. 72, 82, 61 S.Ct. 83, 89, 85 L.Ed. 50, "It is for the Board not the courts to determine how the effect of prior unfair labor practices may be expunged"—an observation made in reliance upon National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S. Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Falk Corporation, 308 U.S. 453, 461, 60 S.Ct. 307, 84 L.Ed. 396, and subsequently quoted and approved in Franks Bros. Co. v. National Labor Relations Board, 321 U.S. 702, 704, 64 S.Ct. 817. It is no doubt true that a company union may equally be promoted albeit, more subtly, by opposition to a competitive union than by direct promotion. As we observed in National Labor Relations Board v. Clinton Woolen Mfg. Co., 141 F.2d 753, 758, "Interference, coercion, and domination are active processes. They may, of course, be inferred from a course of conduct even though no overt acts are proved, and inferences are for the Board to draw and not for us. The Board must be, as always it has been, upon its guard against subtle evasions by which attitudes, fair on their face, realistically viewed, amount to interference and coercion."

■ Having concluded that the Board was within its competence in finding interference with the free choice of the respondent's employees because of intimations, promises and thinly veiled threats of supervisory employees against a background of employer hostility to unions, we may not say that the Board was without legal power to infer that the Co-operative majority in the respondent's plant was not an un-coerced majority. The rationalization in International Association of Machinists v. National Labor Relations Board, supra, applies to the present case—"To be sure, it does not appear that the employer instigated the introduction of petitioner into the plant. But the Board was wholly justified in finding that the employer 'assisted' it in its organizational drive. Silent approval of or acquiescence in that drive for membership and close surveillance of the competitor; the intimations of the employer's choice made by superiors; * * * the employer's known prejudice against the U.A.W., were all proper elements for it to take into consideration in weighing the evidence and drawing its inferences. To say that the Board must disregard what preceded and what followed the membership drive would be to require it to shut its eyes to potent imponderables permeating this entire record. The detection and appraisal of such imponderables are indeed one of the essential functions of an expert administrative agency." There are undoubtedly distinguishing features to be noted between the facts of the cited and the present case. The differences are, however, mainly those of degree and not of kind. We are compelled to conclude that the Board was warranted in finding that the respondent assisted in the formation of the Co-operative, and so its directives for the disestablishment and nonrecognition of the Co-operative as bargaining agency, must be sustained.

■ There must, however, be some modification of the Board's order in respect to the reinstatement of some of the respondent's employees, and in the requirement that they be compensated for their loss of pay by reason of alleged discriminatory discharges. The discharges of Lehl and Suer, dippers, were clearly, upon the record, the result of lack of work and the vote of the men in the department to eliminate the practice of alternating between the dipping and the glaze rooms, and were made in pursuance of the company policy not to demote employees displaced by lack of work. The evidence in respect to their discharge appears to be undisputed. A statement by foreman Harms, made subsequent to the discharge, that Suer and Lehl "got the works," cannot be considered substantial evidence of discrimination since the discharges were ordered from above in strict accordance with seniority. They should not be reinstated.

Felong and Baxter were lowest in seniority among the dippers, and when reduction in work after the April strike necessitated further curtailment of employment, both asked for and were given other jobs but found them too heavy. No lighter jobs being available, except such as would have meant definite demotion, they were let out. There was no substantial evidence that their discharge was the result of discrimination for union activity, especially in view of the fact that Wendt's discharge under

similar circumstances was held justified, and Anderson, president of the local, was retained. They are not entitled to reinstatement.

The alleged discrimination against Pearl, Dacko, Behnke, Holmes, and Mokanyk, requires special mention. The trial examiner found that by discharging these men on November 27, 1941, the respondent discriminated against them because they had engaged in concerted activity protected by the Act. The Board, however, overruled the Examiner and found that by refusing to work overtime, and leaving their jobs before the close of the working day, all five employees had clearly indicated their unwillingness to continue working under the terms prescribed by the respondent; that when they returned to work the following morning the respondent had reason to believe that they would again engage in like activity whenever they should be required to follow similar work orders. It held that the respondent, under the circumstances, was not prohibited by the Act from refusing to permit them to return until they had indicated a disposition to accept the respondent's terms and conditions of employment; that the respondent did not discriminate against them,—they were legally discharged. The Board found, however, that Pearl and Dacko were discharged for the added reason that they had, without permission, pulled switches in an effort to stop production, and they were denied reinstatement. It held, however, that since the work of Behnke, Holmes, and Mokanyk ceased in consequence of and in connection with a labor dispute concerning the terms of their employment, they remained employees within the meaning of § 2(3) of the Act, 29 U.S.C.A. § 152(3), and the respondent could not terminate their employment because they had engaged in such activity.

■ It is clear that Behnke, Holmes, and Mokanyk did not regard themselves as on strike until the strike began on the 24th, for all of them returned to the plant on the 22nd and were paid off. It is not explained how these men could be legally discharged and yet remain employees. If, as the Board concluded, they were discharged in pursuance of a labor dispute such as is contemplated by the Act, that dispute began when the men walked out, and the respondent's refusal to permit them to work the next day, was illegal. The Board, however, found the contrary, and

that the men joined the strike only on the 24th. The Board's conclusions are not supported by its findings, and the order for reinstatement of Behnke, Holmes, and Mokanyk, will be set aside.

■ The Board found that the November strike was, in substantial measure, caused by the respondent's unfair labor practices, and has ordered all strikers, except those specifically excluded, to be reinstated with back pay. Among the causes for the strike was the discharge of the five employees, including the two who pulled the switches and left their jobs on November 21. While this alleged unfair labor practice now disappears as a legitimate grievance because of the finding of the Board that all five men were lawfully discharged, yet the underlying causes of the strike were found by the Board to reside in an unlawful course of conduct, including discrimination against other employees, interference with the formation of the Co-operative, and attempts to dissipate the strength of the C.I.O. We are not, therefore, permitted under the reasoning of International Association of Machinists v. National Labor Relations Board, supra, to reject the Board's inference that such continued practice was a substantial and motivating factor in causing or prolonging the strike, even though it was precipitated by discharges which the Board now finds to have been justified. The contention that the earlier cases of discrimination were settled by an award made by Captain Leonard of the State Police, who, as an arbitrator, compromised the grievances that led to the April strike, must be rejected. The Leonard award was purely a temporary compromise to get the men back to work, and was specifically without prejudice to such action as the Board might later take in respect to such grievances.

■ The respondent, however, insists that the violence which occurred during the April strike absolves it from responsibility for the reinstatement of those who struck in November, under the doctrine of National Labor Relations Board v. Fansteel Corporation, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599. But substantially all of the strikers now ordered reinstated and charged with violence at the April strike, were taken back when that strike was settled, and to some extent, at least, their violence was condoned. The Board, however, refused re-

268

instatement to an employee who was convicted in the local court for malicious destruction of property by overturning the car of a non-striker, yet it affirmed the Examiner's order for the reinstatement, with back pay, of Shieble who was convicted of assault and battery. It is difficult to perceive why the latter offense was not as serious an act of violence as the former, and both are equally established by conviction without implication that either was denied a fair hearing. While we are bound by fact findings of the Board, based upon evidence and reasonable inferences drawn therefrom, we are not, we think, concluded from setting aside a finding or directive that appears to be arbitrary or capricious. The order for Shieble's reinstatement should be set aside. The violence of these two employees, so clearly established by their convictions, is not, however, to be imputed to other union members in the absence of proof that identifies others as participating in such violence. 29 U.S.C.A. § 106 (Norris-LaGuardia Act); National Labor Relations Board v. Ohio Calcium Co., 6 Cir., 133 F.2d 721.

The order of the Board will be modified in the respects indicated, and as so modified a decree may be presented for its enforcement.

Modified and affirmed.