## NATIONAL LABOR RELATIONS BOARD v. SCULLIN STEEL CO.

### No. 13442.

Circuit Court of Appeals, Eighth Circuit.
April 25, 1947.

Marcel Mallet-Prevost, of Washington,
D. C., Attorney, National Labor Relations
Board (Gerhard P. Van Arkel, General
Counsel, Morris P. Glushien, Associate

General Counsel, A. Norman Somers, Asst. General Counsel, and Thomas C. Marshall, Attorney, all of Washington, D. C., on the brief), for petitioner.

James E. Garstang, of St. Louis, Mo. (George A. McNulty and Carter, Bull, Garstang & McNulty, all of St. Louis, Mo., on the brief), for respondent.

Before GARDNER, THOMAS and RIDDICK, Circuit Judges.

GARDNER, Circuit Judge.

This matter is before us on a petition to enforce a cease and desist order of the National Labor Relations Board.

The order is based upon findings that respondent, in violation of Section 8(1) of the National Labor Relations Act, 29 U.S.C.A. § 158(1), interfered with, restrained and coerced its employees in the exercise of their rights guaranteed in Section 7 of the Act, 29 U.S.C.A. § 157, and gave assistance to the Independent Steel Workers Organization, and, in violation of Section 8(3) and (1) of the Act, discriminated against certain employees because they were active on behalf of outside unions or because they opposed the Independent Steel Workers Organization. The order required respondent to cease and desist from its unfair labor practices, from recognizing the Independent as the representative of any of its employees and from giving effect to any contract with the Independent unless and until the Independent should be certified as such representative by the Board; to withdraw and withhold any recognition from Independent Steel Workers Organization as the representative of any of its employees for the purpose of dealing with respondent concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of employment; to reinstate with back pay certain employees discriminated against, and to post appropriate notices.

Respondent is a Missouri corporation with its principal office and place of business at St. Louis, Missouri, where it is engaged in the manufacture, sale and distribution of under carriages for railroad cars, steel castings, and other miscellaneous products.

Prior to the organization of the Independent Steel Workers Organization there had been two successive organizations of employees of respondent, but on December 11, 1941, pursuant to stipulation, the Board entered its order requiring respondent to cease and desist giving effect to a contract theretofore entered into between the then existing union and respondent, and on February 14, 1942, this court entered an order enforcing the Board's order.

Early in 1941 the employees of respondent commenced organization of the Independent, and on December 10, 1941, respondent was advised by letter from the Regional Director of the National Labor Relations Board that Steel Workers Organizing Committee had filed a charge alleging company domination of the Independent. These charges were subsequently withdrawn. On February 3, 1942, a consent election agreement was entered into, pursuant to which an election was held under supervision of the Board on February 12, 1942. Subsequently objections were filed to the election which the Board sustained. A second election was held under the supervision of the Board, and on May 6, 1942, the Regional Director issued a report finding that the Independent had been elected as the representative of respondent's employees, 868 votes being cast for the Independent and 285 votes against it. Following notification to respondent by the Regional Director, negotiations were entered into between Independent and respondent resulting in a contract covering wages and working conditions. The contract by its terms became effective for one year beginning August 2, 1942, but contained an automatic renewal clause, by operation of which the contract was in effect at the time of the hearing. In August 1944, respondent began deducting Independent dues from the wages of Independent members who signed voluntary authorization cards for such deductions. This arrangement followed a request by Independent for such deductions.

The Board found that following the formation and certification of Independent respondent gave assistance to that organization by remarks of its supervisory employees in apposition to the C.I.O. and the

A.F. of L., and in favor of the Independent, by permitting solicitation of Independent membership during working hours, while enforcing its no solicitation rule where outside. unions were involved, by discriminating against employees who were active in behalf of outside unions or who opposed the Independent. The Board found that, "Although we are of the opinion that the respondent's conduct in these respects is insufficient to constitute domination of the Independent within the meaning of Section 8 of the Act, we are satisfied, and we find, that by such conduct the respondent unlawfully assisted the Independent and interfered with, restrained and coerced its employees in the exercise of the rights·guaranteed in Section 7 of the Act. We further find that because of the illegal assistance by the respondent, the contract between it and the Independent was invalid."

As already observed, in its order to cease and desist the Board required respondent to cease giving effect to its contract with the Independent.

In resisting the petition to enforce· petitioner's cease and desist order respondent contends that: (1) the board was not warranted in ordering respondent to cease and desist from recognizing the Independent Steel Workers Organization as the representative of its employees; (2) that there is no substantial evidence to support the Board's finding that respondent unlawfully assisted the Independent Steel Workers Organization in violation of Section 8(1) of the Act; (3) that if such assistance were rendered it would not effectuate the termination of the contract between respondent and Independent; (4) there is no substantial evidence to support the Board's finding that respondent discriminated against Modie Shaw and Charles B. Starks because of the union affiliations or activities of said employees.

Prior to entering into the contract with Independent that union had been certified as the representative of respondent's employees. It was then determined that Independent was not dominated by respondent. As a result of the hearing in the present proceeding the Board again found that Independent was not dominated by respondent. The acts found by the Board to be violative of the Labor Relations Act in giving assistance to Independent all occurred after Independent had been certified as the representative of respondent's employees and after the contract between respondent and Independent had been executed. The Board found that respondent, following the disestablishment of prior unions, "had wiped the slate clean" and that "the respondent did not recognize the Independent or enter into bargaining relations with it until the Regional Director, after investigating charges of company domination filed by the S.W.O.C., and after conducting a consent election, notified the respondent that the Independent had been elected as the bargaining agent of respondent's employees." The Independent was therefore recognized as a lawful and proper labor organization.

Section 7 of the Act provides that, "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

One of the most important rights guaranteed to employees is that of collective bargaining through representatives of their own choosing. Section 8 of the Act forbids an employer to interfere with, restrain or coerce employees in the exercise of the·rights guaranteed in Section 7. The purpose of the Act was to compel employers to bargain collectively with their employees to the end that employment contracts binding on both employer and employee should be negotiated. N. L. R. B. v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682; Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126. There is imposed upon the employer the obligation to bargain with his employees collectively, and included within this obligation is the duty to sign a written contract if the parties reach an agreement which the Board by appropriate order may enforce. H. J. Heinz Co. v. N. L. R. B., 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309 There is no claim and the Board did not find that the contract here under review was invalid on its ·face, nor is there any

claim that the contract had been terminated by any agreement of the parties. By this contract Independent became the bargaining agent of respondent's employees in a designated unit, having been selected as such by a majority of the employees. The authority of the Independent as a bargaining agent could, we think, be terminated only by the agreement of the parties or by operation of law. The Board found that the parties were in such relations to each other as to entitle them to enter into this contract, and it is found that that relation still exists.

 The Board, under Section 10 of the Act, 29 U.S.C.A. § 160, had power to require an offending employer "to cease and desist from such unfair labor practice, and to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies" of the Act. This power is not, however, unlimited. The Board is not authorized to break some other law as a means of enforcing the provisions of this act. Southern Steamship Co. v. N. L. R. B., 316 U.S. 31, 62 S.Ct. 100, 86 L.Ed. 479; N. L. R. B. v. Fansteel Corporation, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; Consolidated Edison Co. v. N. L. R. B., supra. Here the Board violates the contract of agency entered into by competent parties for a lawful purpose. The employees had the right to designate Independent as their bargaining agent. The Board issued its certificate and it became incumbent upon respondent to recognize Independent as the representative of its employees. Valley Mould & Iron Corporation v. N. L. R. B., 7 Cir., 116 F.2d 760. If there were doubt as to whether Independent remained the choice of the employees the Board had authority to settle that question by requiring an election, but this it did not do. In Consolidated Edison Co. v. N. L. R. B., supra [306 U.S. 197, 59 S.Ct. 219], the Supreme Court considered an order of the Labor Board which in effect invalidated contracts entered into between the representative of the employees and the employer. Observing that the Act gave no express authority to the Board to invalidate contracts with independent labor organizations and that the authority, if it

existed, must rest upon the provisions of Section 10(c), which authorizes the Board to take such affirmative action as will effectuate the policies of the Act, the court said: "We think that this authority to order affirmative action does not go so far as to confer a punitive jurisdiction enabling the Board to inflict upon the employer any penalty it may choose because he is engaged in unfair labor practices, even though the Board be of the opinion that the policies of the Act might be effectuated by such an order."

In the Edison case, as in the case at bar, the union was not dominated by the employer. The court further said:

"Here, there is no basis for a finding that the contracts with the Brotherhood and its locals were a consequence of the unfair labor practices found by the Board or that these contracts in themselves thwart any policy of the Act or that their cancellation would in any way make the order to cease the specified practices any more effective.

"The Act contemplates the making of contracts with labor organizations. That is the manifest objective in providing for collective bargaining. Under Section 7 the employees of the companies are entitled to self-organization, to join labor organizations and to bargain collectively through representatives of their own choosing. The 80 per cent of the employees who were members of the Brotherhood and its locals, had that right. They had the right to choose the Brotherhood as their representative for collective bargaining and to have contracts made as the result of that bargaining. * * *

"We conclude that the Board was without authority to require the petitioning companies to desist from giving effect to the Brotherhood contracts, as provided in subdivision (f) of paragraph one of the Board's order."

In the instant case there is no relation between the alleged unfair labor practices of respondent and its contract with its employees. As said by the Supreme Court in the Edison case, supra, "Here, there is no basis for a finding that the contracts with the Brotherhood and its locals were a consequence of the unfair labor practices found

by the Board or that these contracts in themselves thwart any policy of the Act * * *."

There does not seem to be even a suspicion that the Independent did not remain the choice of the majority of the employees. The Labor Act contemplates the making of such contracts as a means of obviating labor disputes which might result in interfering with interstate commerce. To destroy the contract here does not tend to effectuate the policy of the Act, but to thwart it.

By its cease and desist order respondent was required to cease and desist from "discouraging membership in American Federation of Labor and its affiliated international unions, United Steel Workers of America, District No. 34, C.I.O., or any other labor organization, or encouraging membership in Independent Steel Workers Organization or any other labor organization, by discharging or refusing to reinstate any of its employees, or in any other manner discriminating in regard to their hire or tenure of employment or any term or condition of their employment." This in effect is embodied in that part of the order which requires the respondent "to cease and desist in any other manner from interfering with or coercing its employees in the exercise of the right of self-organization, etc." The order follows the findings to the effect that respondent had been guilty of unfair labor practices in these regards.

In considering the acts which the Board found to be unfair labor practices chargeable to respondent, it is important to have in mind that so far as reflected by the record in this proceeding, during the time following the election which resulted in the certification of Independent as the bargaining agent for respondent's employees, the issue as to the right of representation was not a contested nor a debatable one. Rival organizations were not bidding for nor contesting that right and industrial peace reigned in respondent's factory. On November 17, 1941, and again in April, 1943, respondent posted notices clearly indicating that all employees in a supervisory capacity were forbidden to interfere in any manner with the freedom of action and choice of employees in joining or not joining labor organizations or collective bargaining groups. We think we should confine our consideration to the acts of respondent subsequent to the organization of the Independent.

The Board considered two classes of supervisory employees: (1) those concededly occupying supervisory positions, and (2) those characterized as minor supervisors and other employees. As to supervisory employees the Board found that in June, 1943, personnel manager Simmons told employee Melton that there was a union there in the company which he could join, and shortly thereafter general foreman Cain warned Melton that if he did not get that A.F. of L. button off he would be discharged. During the summer of 1943, works manager Walsh sent for employee Jim Austin and told him that he would be discharged if he did not stop being active around there in the A.F. of L., signing up cards on the premises. As to this the Board found that at the same time Independent stewards were openly soliciting memberships during working hours. At about the same time employees Whittaker and Shaw were warned against union activities on company time. In November, 1943, general foreman William Britt, when transferring James Swanagan to another job, told him if he wanted to get along with the boys he should join the Independent. In June, 1944, assistant works manager Otto Hacker assembled a group of employees under him and informed them that the Independent was putting through a raise of wages for them.

Respondent argues that taken as a whole the conversations with Melton do not indicate a threat but friendly warnings to quit soliciting union membership on company time. We do not think the Board was bound to draw that inference. The finding as to Austin is that he was warned against soliciting on the job. Whittaker and Shaw were warned against the same thing. The remarks of Britt to Swanagan were not coercive. Fairly construed they were to the effect that if he wanted to get along with his fellow workers, as distinguished from management, he should join the Independent. As the Independent was the representative of respondent's em-

ployees, chosen by themselves without influence from respondent, this could scarcely be said to be in the nature of a threat or coercive. As to the statement that Independent had put through a raise for the employees, it was literally true. It brought about an agreement with respondent for an increase of wages and made joint application to the Labor Board for its approval.

■ This leaves one remark which might be construed to be threatening—the remark made by a supervisory employee to Melton. Over a period of several years, the making of a single unwarranted remark to an employee, in the face of respondent's definite public announcement of its policy, the certification of Independent as the employees' representative, and a record otherwise clear of labor union hostility, is, we think, insufficient to sustain a finding of domination or interference. Humble Oil & Refining Co. v. N.L.R.B., 5 Cir., 113 F.2d 85; Martel Mills Corporation v. N.L.R.B., 4 Cir., 114 F.2d 624; N.L.R.B. v. Mathieson Alkali Works, 4 Cir., 114 F.2d 796; N.L.R.B. v. Whittier Mills Co., 5 Cir., 111 F.2d 474; Quaker State Oil Refining Co. v. N.L.R.B., 3 Cir., 119 F.2d 631; N.L.R.B. v. Clinton Woolen Mfg. Co., 6 Cir., 141 F.2d 753; Utah Copper Co. v. N.L.R.B., 10 Cir., 139 F.2d 788; N.L.R.B. v. J. L. Brandeis & Sons., 8 Cir., 145 F.2d 556.

As to the minor supervisors whose actions are characterized as unfair labor practices chargeable to respondent, all four of them were members of the bargaining unit and had been approved as eligible to vote by representatives of the C.I.O. and the National Labor Relations Board. These four were instructors Abe Phillips and Frederick Thompson, and lead burners John Scott and Robert Williams. The Board's findings as to these men may be summarized as follows: Abe Phillips had been employed by respondent for thirty-two years, and since September, 1943, had been a core maker instructor, engaged in teaching young or inexperienced core makers how to make cores. He reported to higher supervisory employees the progress being made by new core makers, and he had the right to recommend to the boss whether a new man should be retained on

that particular job or whether he should not. Thirty or thirty-five men were under him. John Scott was classified as a lead burner. General foreman Britt was asked to name the foreman under him, and among others he named John Scott and Robert Williams. The Board did not set out the testimony of Britt, but it is as follows:

"On the south side in the south plant I have John Scott on days as my lead burner. On days, 7 to 3, in the south plant I have Alvin Waters.

"Q. Foreman or lead man? A. Foreman over the welders. On nights in the south plant I have Robert Williams, who is lead burner."

Scott had been a burner for about five years. He had supervision over more than thirty burners and chippers on his shift, and he gave them orders what to do, issued passes to employees honored by the guards, permitting them to pass through the plant gates. He shared a locker room with Abe Phillips and one or two others, apart from the room used by employees generally. Robert Williams was assigned to the night shift over about eight burners. Britt remained on duty for about three hours of the night shift and then left instructions with Williams as to what work was to be done during the remainder of the shift. He assigned burners to various jobs in the department, was responsible for deciding as to the length of lunch periods during his shift and for seeing that the work assigned to the shift was completed before the men left to go home. When employee Hingo was transferred to the night shift by Britt, Britt told him that Williams would be his foreman and instructed him to follow Williams' orders. Frederick Thompson had been an instructor of chippers since 1942. He instructed fifteen to twenty employees. William Whitmire, assistant to the general foreman, testified that Thompson reported to him as to whether or not employees were progressing with the work.

■ The fact that these employees were considered as eligible to vote at the election was tantamount to a ruling that they were not supervisory employees, and they had a right to express their opinion at and prior to the election, and as their status was

not changed that right continued subsequent to the election. It would be an anomaly to hold that they were employees entitled to vote for a representative, and then to hold that subsequent to the election respondent should be held liable for remarks made by them as to labor matters. These men may properly be characterized as key men, chosen for their ability from among the employees. It is not shown that additional compensation was paid them. They had no power to hire nor discharge. One was said to have the right to recommend the hiring of new men based upon his observation as to their competency. They were in no sense supervisory employees. N.L.R.B. v. Arma Corporation, 2 Cir., 122 F.2d 153; N.L.R.B. v. Sun Shipbuilding & Dry Dock Co., 3 Cir., 135 F.2d 15. This view is strengthened by the fact that there was a total absence of antagonism between management and employees or their organization.

There remains to consider the finding with reference to discharges of certain employees which the Board found to be discriminatory. These employees were Needham Whittaker, Gennie Melton, Modie Shaw, Charles Starks and James Troupe. Respondent was ordered to offer reinstatement as to all but Troupe who is found to have been reinstated as an employee, but as to all of the others respondent was ordered to make them whole for any loss of pay suffered. Respondent resists enforcement of the order only as to Modie Shaw and Charles Starks.

Modie Shaw was craneman who had worked for respondent since 1916. He joined the C.I.O. in 1941 or 1942, and the A.F. of L. in June, 1943. He solicited membership in the A.F. of L. among employees of respondent. The Board found that Alvie Byrd, a steward of Independent, urged Shaw during working hours to leave the A.F. of L. and join the Independent, or he would be "kicked out." Shaw was warned by instructor Phillips that he would be discharged for being in the A.F. of L. It is observed that neither of these was connected with the management and these incidents may therefore be disregarded. Works manager Walsh sent for Shaw and asked why the men out in the shop were

dissatisfied. About two weeks later Walsh again sent for Shaw, and the conversation is testified to by Shaw as follows: "He said to me, 'I had you in here about a week ago.' I said, 'No, not a week ago, two weeks ago.' He said, 'Anyway, I heard about you out there on the union activities. If I hear it again, out you go.' I told him, 'I am not practicing union activities in the shop at all.' He said, 'You heard what I said.' I replied, 'Who told you?' He said, 'I don't care who told me, I got it from good information.'"

On Saturday, September 25th, Shaw was taken off the large crane he customarily operated and was temporarily assigned to a "gantry crane," a smaller crane for the operation of which the pay of one regularly assigned to it is lower than the pay Shaw was receiving for operating the larger crane. Shaw became angry, abandoned his work and walked out of the plant. On the following Monday he returned to the plant but was not permitted to resume work. Shaw admitted that he had made a little mistake on Saturday but was ready to correct it and go back to work. Walsh, however, told him he would have to settle the matter with employee Byrd, an Independent steward, and Egan, his immediate foreman. Shaw inquired whether he could ask the two men to come to Walsh's office but this Walsh refused to permit. Shaw then went to the office of the personnel manager but he was not in and when Shaw announced his name an assistant in the office gave him a "pink slip" and he was paid off. Shaw reported his discharge to Skaggs, a general representative of the A.F. of L. who telephoned personnel manager Simmons and asked for Shaw's reinstatement. Simmons, however, refused because Shaw had walked off the job and quit.

The Board found that Shaw had made a mistake in walking out in anger when assigned to the gantry crane, but justified his reinstatement on two grounds. One of these was that Simmons had once told Shaw, after Shaw had had a quarrel with another employee, that "the thing for him to do when he got in the heat of a dispute or something like that was to come in his office if it happened around the place

anywhere." The Board further said that Shaw was "cooling off," as he had been advised to do. The situations, however, are not parallel. Here Shaw was not quarreling with another employee but he was refusing to work as he had been directed to do by his immediate superior. As said by us in N.L.R.B. v. Kopman-Woracek Shoe Mfg. Co., 8 Cir., 158 F.2d 103, 108, "The employer has the undoubted right to direct the employee as to the task to be performed and the manner of its performance."

In N.L.R.B. v. Montgomery Ward & Co., 8 Cir., 157 F.2d 486, 496, we said, "Any employee may, of course, be lawfully discharged for disobedience of the employer's directions, in breach of his contract. N.L.R.B. v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682; N.L.R.B. v. Columbia Products Corporation, 2 Cir., 141 F. 2d 687."

There was legitimate cause for Shaw's discharge, and hence, if he were discharged there was no obligation to reinstate him. If it be said that he quit his job, this being without legitimate cause, there would likewise be no obligation to reemploy him. Finally, it is said that the same offense had been committed in the past with less serious consequences and there is cited the case of employee Eldridge. He, however, did not quit and walk off the job. There is also cited the case of an assault by this same employee upon the foundry superintendent for which he was only laid off for a few hours. Other offenses, however, have but a remote bearing and it is manifest from the record that the examiner so held, for in the course of the examination concerning the incident referred to the examiner said, "So far as I am concerned, it is pointless to go into the matter." It was not therefore fairly developed so that the two incidents and the discipline administered can not be fairly compared. Circumstances may entirely change the aspect of a given situation, and one supervisory employee may view one offense with a more serious eye than another so that the penal factor enters into each

independent situation. It seems sufficient in the Shaw matter to observe that he quit, and having walked off the job respondent was not obliged to rehire him, but, as above observed, whether it be held that he quit of his own volition or was discharged, the result would seem to be the same as in either event there would be no obligation to reinstate.

Charles Starks was employed in November, 1939, and worked as a crane operator. He was quite outspoken in behalf of the employees as against the management, but no legitimate reason appears for his discharge. The Board, we think, could under the evidence have properly inferred that his discharge was for no valid reason except to silence the champion of the cause of the workers. To relate the details surrounding his discharge would serve no useful purpose.

The order appealed from will be modified so as to require respondent to cease and desist from discharging or refusing to reinstate any of its employees because of their union affiliations or activities, or in any other manner discriminating in regard to their hire or tenure of employment or any term or condition of their employment; also to offer to Needham Whittaker, Gennie Melton and Charles Starks immediate and full reinstatement to their former or substantially equivalent positions without prejudice to their seniority and other rights and privileges and to make them and one James Troupe, also improperly discharged, whole for any loss of pay they may have suffered by reason of respondent's discrimination against them, by payment to each of them of a sum of money equal to the amount which he normally would have earned as wages from the date of respondent's discrimination against him to the date of respondent's offer of reinstatement, less his net earnings during said period; also to post appropriate notice at the plant and give written notice to the Regional Director as to what steps respondent has taken in compliance with the order. As so modified the order will be enforced.