# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 5, 2012          Decided November 20, 2012

No. 11-1295

SFO GOOD-NITE INN, LLC,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with No. 11-1325

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

*Patrick W. Jordan* argued the cause for petitioner. With him on the briefs was *Nanette Joslyn*.

*MacKenzie Fillow*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Usha Dheenan*, Supervisory Attorney.

Before: ROGERS and GARLAND, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*:  SFO Good-Nite Inn, LLC, withdrew recognition of Unite Here! Local 2 based on anti-union petitions that the National Labor Relations Board found were impermissibly tainted by Good-Nite's unlawful assistance to the decertification effort in violation of sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5).  Good-Nite petitions for review on the principal ground that the Board applied the wrong line of its precedent, *Hearst Corp.*, 281 N.L.R.B. 764 (1986), and expanded the conduct covered by it, unreasonably departing from its settled causality precedent in *Master Slack Corp.*, 271 N.L.R.B. 78 (1984).

Regardless of whether the Board previously forthrightly explained the distinction between these two lines of its precedent, the Board has now articulated a clear line for applying the *Hearst* presumption of taint in "the narrow circumstance where an employer unlawfully instigates or propels a decertification campaign, and then invokes the results of that campaign to justify its unilateral withdrawal of recognition from its employees' representative."  *SFO Good-Nite Inn, LLC*, 357 N.L.R.B. No. 16, at 4 (July 19, 2011).  The Board explained that the *Hearst* presumption applies where the employer is directly involved in advancing a decertification petition, whereas the *Master Slack* test applies where the employer committed unfair labor practices unrelated to the petition that may have contributed to the erosion of support for the union.  Upon finding that Good-Nite directly assisted and advanced the decertification effort by coercively asking employees to sign the petitions and unlawfully threatening to fire an employee for opposing it, the Board applied the *Hearst* presumption as there was no need to make a specific causation finding under *Master Slack*.

We hold that the Board's *Hearst* presumption is reasonable and consistent with the Act, and that the Board's factual findings are supported by substantial evidence in the record. Accordingly, we deny the petition for review and grant the Board's cross application for enforcement.

**I.**

In March 2004, Good-Nite purchased a hotel located near the San Francisco International Airport and assumed the prior owner's obligations under a collective bargaining agreement with housekeeping and janitorial employees represented by Unite Here! Local 2 ("the Union"). At the relevant time the represented unit consisted of 24 employees. The agreement was due to expire in November 2004, but in August 2004 Good-Nite and the Union agreed that it would remain in effect during their renegotiations for a new agreement.

During a bargaining session on August 23, 2005, the Union demanded that Good-Nite discharge five new housekeepers unless they paid union dues pursuant to a union-security clause in the agreement. On August 31, Good-Nite general manager Azfal "A.C." Chaudhry and banquet manager Naomi Grace Vargas met with two of those housekeepers, Cristina Valencia and Maria Maldonado. At the meeting, Chaudhry told Valencia and Maldonado about the outstanding dues, stated that the Union was "no good," and asked them to consider signing a "paper" to eliminate the Union. According to Valencia, Chaudhry questioned why they wanted a union when he was willing to give them paid vacation and health insurance, benefits they were not then receiving. Two hours later, Vargas approached Valencia and told her that Chaudhry was waiting for her response. Neither Valencia nor Maldonado signed a decertification petition. Maldonado told co-worker Luz Verdin

that she was afraid management would make her sign a petition or lose her job.

Also in late August, Good-Nite assistant manager Leah Aquino approached housekeeper Margarita Taloma and asked her to sign an anti-union petition. A few days later Aquino unexpectedly arrived at Taloma's home and again asked her to sign a petition. Taloma refused. Another employee testified that there were "rumors about signatures that were being requested [by Good-Nite management] for non-unionizing." Tr. of ALJ Hr'g, Apr. 18, 2006, at 143.

Valencia, Maldonado, and Taloma all told housekeeping inspector Consuelo Contreras, who was on the Union negotiating committee, about Good-Nite's solicitation of their signatures. On September 6, Contreras urged another housekeeper, Xiang Tan, not to sign the petitions. Two hours later, Chaudhry and Good-Nite's owner, Eric Yokeno, asked Contreras why she was telling employees not to sign the petitions and told her that she could be fired for doing so at work. Good-Nite did not have a work rule against solicitation.

On September 7, Chaudhry fired Valencia and Maldonado, citing a seasonal slowdown in business. This was contrary to Good-Nite's usual practice of laying off employees subject to recall, rather than firing them. Contreras, the employee most knowledgeable about their work, had not been asked about their work performance and thought they were both good workers. Other housekeepers with less seniority who had signed a decertification petition were not fired. By September 7, a Union field representative heard that Good-Nite management had been asking employees to sign a decertification petition.

On September 14, 2005, Good-Nite withdrew recognition of the Union based on petitions signed by 13 of the 24 unit

employees stating that they no longer wished to be represented by the Union. When housekeeper Luz Verdin requested vacation leave, assistant manager Aquino told her on October 4 that she would grant the request if Verdin signed an anti-union petition, which she did. Aquino then backdated Verdin's signature to make it appear that she had signed the petition on or before Good-Nite's withdrawal of Union recognition. On October 14, 2005, the Union filed an unfair labor practice charge with the Board. The General Counsel of the Board issued a complaint on March 1, 2006.

The administrative law judge ("ALJ") found, after a hearing, that Good-Nite had violated section 8(a)(1) of the Act by soliciting employees to sign an anti-union petition with threats or promised benefits; sections 8(a)(3) and (1) by discharging Valencia and Maldonado to discourage union membership and activities; and sections 8(a)(5) and (1) by unlawfully withdrawing recognition of and refusing to bargain with the Union. Applying the four-factor causation test of *Master Slack*, the ALJ found this unlawful conduct had tainted the employee petitions disavowing the Union. The ALJ, in addition to recommending reinstatement of Maldonado and Valencia with back pay and expunging references to their unlawful discharges from Good-Nite's files, proposed a cease and desist order and various affirmative actions, including that Good-Nite bargain with the Union. In March 2008, the Board adopted the ALJ's factual findings and proposed order. *SFO Good-Nite Inn, LLC*, 352 N.L.R.B. 268 (2008). Because the Board's decision was rendered by a non-quorum of only two members, this court vacated the decision in view of *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635 (2010); *Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB*, 564 F.3d 469, 476 (D.C. Cir. 2009), and remanded the case for further proceedings. *SFO Good-Nite Inn, LLC v NLRB*, No. 08-1148 (D.C. Cir. Sept. 20, 2010).

On July 19, 2011, a three-member Board issued a decision incorporating by reference most of the 2008 decision and explaining further why Good-Nite's withdrawal of recognition violated sections 8(a)(5) and (1) of the Act. Agreeing with the General Counsel that Good-Nite's conduct *per se* precluded its reliance on the petitions as a valid basis for withdrawing recognition of the Union, the Board ruled that "the disposition of this case is properly controlled by *Hearst Corp.*, holding that an employer may not withdraw recognition based on a petition that it unlawfully assisted, supported, or otherwise unlawfully encouraged, even absent specific proof of the misconduct's effect on employee choice." *SFO Good-Nite Inn*, 357 N.L.R.B. No. 16, at 1 (footnote omitted). One member dissented in part, on the ground that the *Hearst* presumption should be rebuttable while acknowledging that the difference was immaterial because Good-Nite "failed to show that its misconduct could not have tainted the employees' petition." *Id*. at 5 (Member Hayes, concurring in part, dissenting in part). A unanimous Board adopted the ALJ's proposed order. Good-Nite petitions for review, and the Board cross-applies for enforcement of its Order.

## II.

"[I]t is our longstanding rule that the Board is entitled to summary enforcement of the uncontested portions of its orders." *Carpenters & Millwrights, Local Union 2471 v. NLRB*, 481 F.3d 804, 808 (D.C. Cir. 2007) (internal quotation marks and alterations omitted). The Board accordingly seeks summary enforcement of its unchallenged findings that Good-Nite violated section 8(a)(1) of the Act by soliciting employees Taloma and Verdin to sign an anti-union petition with threats and promised benefits, and by threatening employee Contreras with discharge if she told other employees not to sign the petitions. Because Good-Nite did not file exceptions to these

findings, section 10(e) of the Act jurisdictionally bars Good-Nite from obtaining review of them.  29 U.S.C. § 160(e); *see also W & M Props. of Conn., Inc. v. NLRB*, 514 F.3d 1341, 1345 (D.C. Cir. 2008).   The Board is therefore entitled to summary enforcement of these findings.

The Board also seeks summary enforcement of its Order directing Good-Nite to reinstate employees Valencia and Maldonado.  The Board found that Good-Nite violated sections 8(a)(3) and (1) of the Act by discharging Valencia and Maldonado because they did not sign the anti-union petitions. Good-Nite challenges as clearly erroneous the factual finding that its general manager, Chaudhry, solicited Valencia's and Maldonado's signatures on an anti-union petition.  But it does not challenge the Board's determination that the discharges were unlawful.  Good-Nite acknowledges that other record evidence — namely Chaudhry's possession of the signed anti-union petitions at the time of the firings — would have supported the finding that the firings were unlawful, irrespectively of the alleged solicitations.  The Board is therefore entitled to summary enforcement of the reinstatement portion of its Order.

**III.**

Good-Nite contends that the Board erred in declining to apply its traditional *Master Slack* test to evaluate disaffection petitions for taint and instead adopted a new rule based on "its little cited decision in *Hearst Corporation*," Petr's Br. at 18, under which, it asserts, the General Counsel is relieved of the burden to prove a causal nexus between the employer's conduct and employee disaffection and instead can rely on what Good-Nite characterizes as overbroad "*per se* categories" of conduct, *id*. Objecting that "the Board provided no reasoned explanation for departing from *Master Slack*, [n]or explained how its new rule will not result in arbitrary decisions with no evidentiary

support," *id.*, Good-Nite concludes that the new rule will impede employees' section 7 rights and curtail employers' free speech rights under section 8(c) of the Act. In Good-Nite's view, had the Board properly applied its *Master Slack* precedent and considered all of the evidence, the Board "should have found that the unfair labor practices were isolated, mostly occurring after the Union lost majority support and were unknown to the rest of the bargaining unit." *Id*. at 18–19. Good-Nite ignores the Board's explanation and rationale for applying the *Hearst* presumption and the substantial evidence supporting the Board's factual findings.

**A**. The court "accord[s] a very high degree of deference to administrative adjudications by the [Board]." *United Steelworkers of Am., Local Union 14534 v. NLRB*, 983 F.2d 240, 244 (D.C. Cir. 1993). "The Board, of course, is given considerable authority to interpret the provisions of the [Act]. If the Board adopts a rule that is rational and consistent with the Act, then the rule is entitled to deference from the courts." *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 42 (1987) (citation omitted). Such deference is appropriate here.

Section 8(a)(5) of the Act provides that "[i]t shall be an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). There are circumstances, however, where an employer may unilaterally withdraw recognition from a union if it can show through objective evidence that the union has lost majority support as, for example, by presenting a petition signed by a majority of employees in the bargaining unit stating that they no longer wish to be represented by the union. *See Flying Food Grp., Inc. v. NLRB*, 471 F.3d 178, 182 (D.C. Cir. 2006) (discussing *Levitz Furniture Co.*, 333 N.L.R.B. 717 (2001)). This privilege is not absolute.

In *Hearst Corp.*, 281 N.L.R.B. at 764, the Board found that the employer had unlawfully solicited employee signatures on union decertification petitions. For example, the employer had interrogated employees about their union sympathies, told them their continued representation by the union prevented their receiving better benefits, promised increased benefits and improved working conditions if they withdrew support for the union, and suggested they sign anti-union petitions and persuade their coworkers to withdraw their support for the union. *See id.* The unfair labor practices had occurred prior to and simultaneously with circulation of the petitions by employees. Although decertification petitions signed by a majority of the bargaining unit employees will generally be sufficient objective evidence to provide a reasonable basis for withdrawing recognition, the Board observed that it was "well settled" that an employer's doubt about a union's continuing majority status at the time it withdrew recognition "may not be raised in the context of any employer activities aimed at causing employee disaffection with the union." *Id.* The Board concluded:

> Where an employer engages in such conduct, the decertification petitions will be found to have been tainted by the employer's unfair labor practices and the latter, consequently, will be precluded from relying on the tainted petition as a basis for questioning the union's continued majority status and withdrawing recognition from that labor organization.

*Id.* The Board reached this conclusion, despite testimony from 19 of the 56 employees in the bargaining unit that they were unaware of the employer's unlawful conduct, because an employer should not be able to "enjoy the fruits of its violations by asserting that certain of its employees did not know of its unlawful behavior." *Id.* at 765 & n.9. Drawing on its experience, the Board stated that it based the presumptive

finding of taint "not . . . on a finding of actual coercive effect, but rather on the 'tendency of such conduct to interfere with the free exercise of employee rights under the Act.'" *Id*. at 765 (quoting *Amason, Inc.*, 269 N.L.R.B. 750, 750 n.2 (1984)).

By contrast, the question in *Master Slack* was whether the employer's unremedied flagrant violations from an earlier unfair labor practice case tainted the atmosphere as a matter of law, such that the employer's reliance in withdrawing union recognition on a petition signed 8 to 9 years later by a majority of the bargaining unit employees was unlawful. 271 N.L.R.B. at 79. There were no allegations the employer directly assisted the decertification campaign through improper solicitation, threats, or other misconduct. To determine whether there was a causal relationship between the employer's earlier unlawful conduct and the anti-union petition, the Board applied a four-factor test: "(1) [t]he length of time between the unfair labor practices and the withdrawal of recognition; (2) the nature of the illegal acts, including the possibility of their detrimental or lasting effect on employees; (3) any possible tendency to cause employee disaffection from the union; and (4) the effect of the unlawful conduct on employee morale, organizational activities, and membership in the union." *Id.* at 84. The ALJ found that there was no direct evidence of a causal relationship between the employer's unlawful conduct in 1973-74 and the 1982 anti-union petition, and that the indirect factors were insufficient to preclude the employer as a matter of law from withdrawing recognition. *See id.* at 85. The Board, in adopting the ALJ's findings, noted that the unfair labor practices "occurred many years before the petition's circulation, and that the [employer] ha[d] complied with the ordered remedies in many significant respects well before the petition's circulation." *Id*. at 78 n.1.

In applying the *Hearst* presumption here, the Board began by stating that "it is well settled that an employer may only

withdraw recognition [of a union] if the expression of employee desire to decertify represents the free and uncoerced act of the employees concerned." *SFO Good-Nite Inn,* 357 N.L.R.B. No. 16, at 1 (internal quotation marks omitted).  Although both *Hearst* and *Master Slack* apply this limitation, the Board explained, they do so in two different contexts: "*Hearst* applies when an employer has engaged in unfair labor practices directly related to an employee decertification effort," such as here, whereas *Master Slack* applies to "*other* unfair labor practices distinct from any unlawful assistance by the employer in the actual decertification petition." *Id.* at 1–2 (internal quotation marks omitted).  A causal nexus must be shown in the *Master Slack* line of cases because "there is no straight line between the employer's unfair labor practices and the decertification campaign, and the *Master Slack* test must be used to draw one, if it exists." *Id.* at 2.  By contrast, in the *Hearst* line of cases, "the employer's unfair labor practices are not merely coincident with the decertification effort; rather, they directly instigate or propel it." *Id.*

The Board proceeded to elaborate on the scope and the rationale underlying the *Hearst* presumption.  First, the Board emphasized that the presumption applies only in "the narrow circumstance where an employer unlawfully instigates or propels a decertification campaign, and then invokes the results of that campaign to justify its unilateral withdrawal of recognition from its employees' representative." *Id.* at 4.  It then explained that there is "little need" for a *Master Slack*-type causation analysis in such circumstances because, as it had long observed, the "foreseeable consequence of such misconduct — and frequently its purpose — is . . . to contribute to the union's loss of majority status." *Id.* (internal quotation marks omitted). The Board dismissed any need for evidence that employees who signed a petition knew of the employer's unlawful labor practices because the victims of such practices frequently tell

their co-workers, as occurred here, and thus "'it may be presumed that employees who signed the petition . . . were aware of the [employer's unlawful acts], and such knowledge is likely to have influenced their decision.'" *Id*. at 4 & n.29 (quoting *Caterair Int'l*, 309 N.L.R.B. 869, 880 (1992)). Finally, the Board explained as a matter of policy that its conclusive presumption "provides a strong incentive to employers to steer clear of potentially unlawful conduct." *Id*. at 4.

The Board's articulated distinction between these two lines of its precedent and its reasons for the *Hearst* presumption are rational and consistent with the Act.[1] Good-Nite's citation to Board decisions applying *Master Slack* to determine whether an employer's involvement in a decertification campaign tainted the resulting petitions is unavailing. Whether or not the Board adequately distinguished between these two lines of its precedent in the past, it now has clarified that distinction and explained why the *Hearst* presumption applied to Good-Nite. The Board expressly stated that "[t]o the extent prior cases may have applied *Master Slack* to determine whether unfair labor practices directly related to a decertification effort caused employee disaffection, we clarify them in accordance with this decision." *SFO Good-Nite Inn*, 357 N.L.R.B. No. 16, at 5 n.33. The Board may clarify its rule in this fashion so long as it provides, as here, a rational reason and the clarification does not conflict with the Act. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009). Good-Nite misapprehends the nature of our review when it objects that the Board has not explained why the *Hearst* presumption is "necessary" or a

---

[1] The Fourth Circuit has endorsed the Board's articulated distinction between *Hearst* and *Master Slack*, albeit where the Board consisted of only two members. *Narricot Indus. L.P. v. NLRB*, 587 F.3d 654, 664–65 (4th Cir. 2009), *abrogated on other grounds by New Process Steel*, 130 S. Ct. 2635.

"better tool" than the causation test of *Master Slack*.  Petr's Br. at 39, 41.  The Board "need not demonstrate to a court's satisfaction that the reasons for [one] policy are better than the reasons for [another]; it suffices that the . . . policy is permissible under the statute [and] that there are good reasons for it." *Fox Television*, 556 U.S. at 515.

Good-Nite's other objections are unavailing.  In particular, Good-Nite mischaracterizes the Board's decision when it contends that the *Hearst* presumption adopted by the Board is overbroad because it precludes withdrawal of union recognition "if an employer does anything with or says anything about a disaffection petition." Petr's Br. at 35.  The *Hearst* presumption applies only in "the narrow circumstance where an employer *unlawfully* instigates or propels a decertification campaign." *SFO Good-Nite Inn*, 357 N.L.R.B. No. 16, at 4 (emphasis added).  Similarly, Good-Nite's contention that the *Hearst* presumption will impede employees' section 7 rights overlooks the fact, noted by the Board, that employees may still petition the Board directly for a decertification election, *id.* at 3.

Good-Nite's remaining arguments are unpersuasive.  First, its description of *Hearst* as "little cited" is not well taken. Petr's Br. at 18.  The Board and Good-Nite itself cite Board decisions enforced by the courts that applied the *Hearst* presumption where an employer solicited signatures or otherwise unlawfully encouraged a union decertification process.  *See, e.g.*, *Wire Prods Mfg.*, 326 N.L.R.B. 625 (1998), *enforced mem. sub. nom. NLRB v. R.T. Blankenship & Assocs., Inc.*, 210 F.3d 375 (7th Cir. 2000); *V & S ProGalv, Inc.*, 323 N.L.R.B. 801 (1997), *enforced*, 168 F.3d 270 (6th Cir. 1999); *Am. Linen Supply Co.*, 297 N.L.R.B. 137 (1989), *enforced*, 945 F.2d 1428 (8th Cir. 1991).

Second, Good-Nite attempts to distinguish those cases as limited to circumstances where the decertification petition would have failed "but for" the employer assistance, whereas the presumption in its case applies if an employer merely supports or encourages a decertification campaign. The Board pointed out that none of the cases suggested a "but for" analysis or made such a finding. *See* Respd's Br. 37–38. Regardless, whether or not those cases used a direct cause analysis does not demonstrate the Board erred in applying the *Hearst* presumption here. At oral argument Good-Nite maintained that the *Hearst* presumption should be limited to instances where an employer is directly involved in the preparation and dissemination of a decertification petition. But it offered no persuasive reason why the rationale for such a rule would not extend to instances where an employee created and disseminated the petition but the employer unlawfully and coercively solicited signatures from employees in the bargaining unit, as appears to have occurred in *Hearst* itself, 281 N.L.R.B. at 764.

Good-Nite objects as well to the unrebuttable nature of the *Hearst* presumption adopted by the Board, contending it will result in arbitrary findings without substantial evidentiary support. The Board was in agreement that unlawful employer involvement would presumptively taint an anti-union petition even without specific proof that the employer's conduct affected employee signatures. A majority concluded the presumption should be conclusive because of the "inherent unreliability" of after-the-fact employee testimony about their reasons for rejecting a union. *SFO Good-Nite Inn*, 357 N.L.R.B. No. 16, at 4. One Member urged that the presumption should simply shift the burden to the employer "to present objective proof that its misconduct did not cause or further disaffection," suggesting it is "possible, even if not likely, that subsequent evidence of disaffection by an employee majority is an accurate and reliable

expression of free choice." *Id*. at 5 (Member Hayes, concurring in part, dissenting in part).

The Board majority's preferred conclusive presumption is entitled to deference as rational and consistent with the Act. The Supreme Court has observed that "employees are more likely than not, many months after a card drive and in response to questions by company counsel, to give testimony damaging to the union, particularly where company officials have previously threatened reprisals for union activity in violation of [section] 8(a)(1)." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 608 (1969). Notably, the Supreme Court has endorsed a conclusive presumption adopted by the Board in the context of union recognition. *See Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 785–87 (1996).

**B.** The Board found that Good-Nite unlawfully solicited Valencia's, Maldonado's, and Taloma's signatures on anti-union petitions with threats or promised benefits, and threatened to fire Contreras because she told a coworker not to sign a petition. *SFO Good-Nite Inn*, 357 N.L.R.B. No. 16, at 2. The Board further found that these unfair labor practices "were obviously directly related to furthering the employees' decertification campaign." *Id.* at 3. The Board's factual findings are conclusive if supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e); *Hard Rock Holdings, LLC v. NLRB*, 672 F.3d 1117, 1121 (D.C. Cir. 2012). The court will not reverse the Board's adoption of the ALJ's credibility determination unless it is "hopelessly incredible, self-contradictory, or patently unsupportable." *Hard Rock Holdings*, 672 F.3d at 1121 (internal quotation marks omitted).

Good-Nite contends that some of the unfair labor practices could not have tainted the petitions because they occurred on or

after September 6, when the twelfth unit employee signed a decertification petition and the Union allegedly lost its majority support. Even assuming this is true, Good-Nite does not extend this suggestion to the evidence of its solicitations of Valencia, Maldonado, and Taloma in late August 2005. Instead Good-Nite presents a credibility challenge to the Board's finding that Chaudhry solicited signatures from Valencia and Maldonado. This contention fails.

Valencia consistently testified that Chaudhry asked her and Maldonado at the August 31 meeting to "sign a paper for him that would de-unionize the firm." Tr. of ALJ Hr'g, Apr. 18, 2006, at 161; *see id.* at 182, 189. Good-Nite suggests the "paper" was a Union membership application rather than an anti-union petition because the record does not indicate a petition existed before September 3, 2005. The petitions in the record consist of a single handwritten sentence followed by signatures on blank pages, not technical or complex documents that could not be created on short notice. Because Chaudhry easily could have created a petition if Valencia and Maldonado agreed to sign it, it is irrelevant whether a decertification petition existed at the time of the August 31 meeting.

Additionally, the ALJ credited Valencia's testimony over Chaudhry's denials about what occurred at the August 31 meeting, finding Chaudhry's testimony "unreliable," "shifting," and "evasive," *SFO Good-Nite Inn*, 352 N.L.R.B. at 274 n.5, and the Board adopted the ALJ's credibility determinations in finding that Chaudhry unlawfully solicited their signatures. Although Valencia's testimony was occasionally unclear — and with respect to her subsequent encounter with Vargas potentially inconsistent with her October 2005 affidavit — Good-Nite points to nothing from which the court could conclude this is one of the "most extraordinary circumstances" where a credibility determination should be overturned. *U-Haul*

*Co. of Nev. v. NLRB*, 490 F.3d 957, 962 (D.C. Cir. 2007) (internal quotation marks omitted).

**C**. Finally, Good-Nite contends that parts of the Board's Order are moot and should not be enforced by the court. It relies on its asserted compliance with an affirmative bargaining order issued by the district court that was obtained by the Board's General Counsel following the ALJ's decision. *See Norelli v. SFO Good-Nite Inn*, No. 06-07335, 2007 WL 662477, at *16–17 (N.D. Cal. Mar. 1, 2007); 29 U.S.C. § 160(j). Because it complied with the relief ordered by the district court and that relief was equivalent in material respects to the relief prescribed in the Board's Order, Good-Nite maintains any claim for further enforcement is moot. This contention fails for several reasons.

First, the district court's injunction did not cover all of the relief called for in the Board's Order, such as making whole Valencia and Maldonado, purging Good-Nite's records referring to their unlawful firings, and requiring Good-Nite to turn over certain material to the Board for use in determining compliance. The Board's Order also imposes a continuing obligation for Good-Nite to bargain with the Union while the district court's injunction only ordered Good-Nite to bargain for 90 days. Second, Good-Nite offers no evidence to show it has complied in full with the Board's Order. Moreover, the Supreme Court has held that "'it [is] plain from the cases that the employer's compliance with an order of the Board does not render the cause moot, depriving the Board of its opportunity to secure enforcement from an appropriate court.'" *NLRB v. Raytheon Co.*, 398 U.S. 25, 27 (1970) (quoting *NLRB v. Mexia Textile Mills*, 339 U.S. 563, 567 (1950)). Conceding this point, Good-Nite requests that the court exercise its equitable powers not to enforce the Order's requirements that Good-Nite reinstate Valencia and Maldonado and post for 60 days a signed notice

regarding its violations of the Act and commitment not to repeat them. *See NLRB v. Maywood Plant of Grede Plastics*, 628 F.2d 1, 7 (D.C. Cir. 1980). Other than its bald assertion of compliance Good-Nite offers no explanation why this court should exercise its discretionary powers to deny enforcement of the Board's Order, and we decline to do so.

Accordingly, we deny the petition for review and grant the Board's cross-application for enforcement of its Order.