# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 13, 2015      Decided February 5, 2016

No. 12-1011

RAYMOND INTERIOR SYSTEMS, INC,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

SOUTHERN CALIFORNIA PAINTERS AND ALLIED TRADES
DISTRICT COUNCIL NO. 36, INTERNATIONAL UNION OF
PAINTERS AND ALLIED TRADES, AFL-CIO,
INTERVENOR

———

Consolidated with 12-1012, 12-1013, 12-1047

———

On Petitions for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*James A. Bowles* argued the cause for petitioner Raymond Interior Systems, Inc. *Yuliya S. Mirzoyan* argued the cause for petitioner Southwest Regional Council of Carpenters. On the joint briefs was *Daniel Shanley*.

*Ellen Greenstone* and *Maria Keegan Myers* were on the brief for petitioner Southern California Painters and Allied Trades District Council No. 36, International Union of Painters and Allied Trades, AFL-CIO. *Joseph E. Kolick Jr.* entered an appearance.

*Gregory P. Lauro*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Jill A. Griffin*, Supervisory Attorney.

Before: HENDERSON and TATEL, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: This case involves petitions for review filed by Raymond Interior Systems, Inc. ("Raymond"), and the United Brotherhood of Carpenters and Joiners of America, Local Union No. 1506, an affiliate of the Southwest Regional Council of Carpenters (the "Carpenters Union" or "Carpenters"), and a cross-application to enforce filed by the National Labor Relations Board ("Board" or "NLRB"). The dispute here focuses on orders issued by the Board on September 30, 2010, *Raymond Interior Sys.*, 355 N.L.R.B. 1278 (2010), and December 30, 2011, *Raymond Interior Sys.*, 357 N.L.R.B. No. 166 (Dec. 30, 2011). The Southern California Painters and Allied Trades District Council No. 36, International Union of Painters and Allied Trades, AFL-CIO (the "Painters Union" or "Painters"), the charging party before the Board, also petitions for review because, in its view, the sanctions issued by the Board against Raymond and the Carpenters are insufficient.

For many years, Raymond was a party to collective bargaining agreements with the Painters, the most recent of which was entered into pursuant to Section 8(f) of the National Labor Relations Act (the "Act" or "NLRA"), 29 U.S.C. § 158(f). Section 8(f) allows construction-industry employers to recognize a union as the bargaining agent of its employees before a majority of employees have designated the union as their representative. On September 30, 2006, Raymond lawfully terminated its 8(f) agreement with the Painters.

On September 12, 2006, Raymond and the Carpenters executed a Confidential Settlement Agreement providing that, upon expiration of the Painters agreement, Raymond would apply the Carpenters 2006 Drywall/Lathing Master Agreement ("2006 Master Agreement") to Raymond's drywall-finishing work and employees "to the fullest extent permitted by law." The Confidential Settlement Agreement incorporating the 2006 Master Agreement took effect on October 1, 2006. On October 2, Raymond allegedly told its drywall-finishing employees that they needed to join the Carpenters Union "that day" if they wanted to continue working. Later that day, after the union had secured authorization cards from the employees, the Carpenters and Raymond signed an agreement recognizing the Carpenters as the majority representative of these employees pursuant to Section 9(a) of the Act, 29 U.S.C. § 159(a).

The Painters filed an unfair labor practice charge with the NLRB challenging Raymond's recognition of the Carpenters Union. A complaint was issued and the matter was heard by an Administrative Law Judge ("ALJ"). Regarding the conduct of Raymond and the Carpenters on October 2, 2006, the Board adopted the findings of the ALJ that Raymond violated Section 8(a)(1), (2), and (3) of the Act, 29 U.S.C. § 158(a)(1),

(2), and (3), by conditioning continued employment of the drywall-finishing employees on their immediate membership in the Carpenters Union, and by unlawfully assisting the union in obtaining authorization cards. The Board also agreed that, on October 2, Raymond violated 8(a)(1) and (2) by granting recognition to the Carpenters, and that the union violated Section 8(b)(1)(A) of the Act, 29 U.S.C. § 158(b)(1)(A), by accepting recognition, at a time when the Carpenters did not represent an uncoerced majority of the drywall-finishing employees. The Board additionally agreed that, on October 2, Raymond violated Section 8(a)(3) of the Act, and the Carpenters violated Section 8(b)(2), 29 U.S.C. § 158(b)(2), by applying the Carpenters 2006 Master Agreement to the employees when the union did not represent an uncoerced majority of the employees. Finally, the Board agreed that, on October 2, the Carpenters violated Section 8(b)(1)(A) of the Act by failing to properly inform the drywall-finishing employees of their rights to decline union membership, *NLRB v. Gen. Motors Corp.*, 373 U.S. 734, 742 (1963), and to seek a reduction in union fees for monies spent on activities not germane to the collective bargaining, contract administration, and grievance adjustment, *Commc'n Workers of Am. v. Beck*, 487 U.S. 735, 745 (1988). The Board found it unnecessary to consider the ALJ's findings that Raymond violated the Act on *October 1* when the Confidential Settlement Agreement took effect. Following a motion for reconsideration, the Board again refused to rule on the legality of the Confidential Settlement Agreement, but clarified that its orders should not be interpreted as requiring a Board certification before Raymond could lawfully recognize the Carpenters pursuant to Section 8(f).

Raymond and the Carpenters contend that the Board's findings with respect to the October 2 unfair labor practices are not supported by substantial evidence. We disagree for the

reasons set forth below. Raymond and the Carpenters also contend that the Board erred in failing to address their contention that, on October 1, by virtue of their Confidential Settlement Agreement, the company and union had a lawful Section 8(f) agreement that could not, without more, be vitiated by unfair labor practices that allegedly occurred on October 2. We agree. The Board's failure to address this matter cannot withstand review. We therefore grant in part the Board's application for enforcement, grant in part the petitions for review filed by Raymond and the Carpenters, and remand the case for further consideration by the Board.

Finally, we decline to consider the Painters' principal claim that the Board abused its discretion in declining to require Raymond to provide alternate benefits coverage because our decision to remand on the remedy issue may render the claim moot. We find no merit in the other claims raised by the Painters Union.

## I. BACKGROUND

Raymond is a California-based specialty wall and ceiling contractor in the building and construction industry. Raymond's employees include its drywall-finishing employees, who perform drywall-finishing services in connection with Raymond's various commercial and residential projects.

Since at least the 1960s, Raymond has been an employer-member of the Western Wall and Ceiling Contractors Association, Inc. ("the Association"), a multi-employer association of companies in the building and construction industry. Employer-members choose to join various "conferences" within the Association, and each conference then negotiates and executes collective bargaining agreements

with various unions on behalf of the employer-members. At all relevant times, Raymond was an employer-member of the Drywall/Lathing Conference, which negotiates with the Carpenters Union. Prior to October 1, 2006, Raymond was also an employer-member of the California Finishers Conference, which negotiates with the Painters Union.

From 1960 to 2006, the California Finishers Conference – on behalf of employers including Raymond – negotiated and executed collective bargaining agreements with the Painters Union to apply to drywall-finishing employees. The most recent relevant agreement ("Painters Agreement") expired on September 30, 2006, and Raymond resigned from the California Finishers Conference. Importantly, it is undisputed that the Painters Agreement was entered into under Section 8(f) of the Act, which, as explained below, meant that the Painters did not enjoy a presumption of majority support from the drywall-finishing employees after the agreement expired. For this reason, there is no dispute that Raymond lawfully disassociated itself from the Painters Union after September 30, 2006.

The Drywall/Lathing Conference negotiated collective bargaining agreements with the Carpenters to apply to various Raymond employees. The 2006 Master Agreement ran from July 1, 2006, to June 30, 2010. This agreement contained a union-security clause, which required employees, as a condition of employment, to apply for union membership by the eighth day of employment. The 2006 Master Agreement also provided that, in the event that an employer ceased to be signatory to a contract with the Painters Union covering drywall-finishing employees, then the 2006 Master Agreement would cover those drywall-finishing employees.

## A. The Application of the Master Agreement to the Drywall-Finishing Employees on October 1, 2006

On May 24, 2006, Raymond sent the Painters a letter stating that Raymond would not renew the Painters Agreement after it expired. Apparently, this fact became "well known" and, soon afterward, the Carpenters expressed to Raymond that it should apply the 2006 Master Agreement to Raymond's drywall-finishing employees once the Painters Agreement expired. On September 12, 2006, Raymond and the Carpenters signed a Confidential Settlement Agreement, in which Raymond promised to apply the 2006 Master Agreement to its drywall-finishing employees at the expiration of the Painters Agreement. Raymond also promised to execute a "Memorandum Agreement," a short-form version of the 2006 Master Agreement, although it never did so.

On October 1, 2006, immediately upon expiration of the Painters Agreement, Raymond and the Carpenters began covering Raymond's drywall-finishing employees under the 2006 Master Agreement pursuant to the terms of the Confidential Settlement Agreement. There is no allegation that Raymond and the Carpenters committed any unfair labor practices prior to this date.

## B. The Events of October 2

On October 2, 2006, Raymond held a meeting with the drywall-finishing employees at the company's Orange, California, facility. The purpose of the meeting was to inform the drywall-finishing employees of the transition from the Painters to the Carpenters, the new wage packages and benefits, and the need for employees to sign insurance and pension forms.

The meeting took place in Raymond's training room, which was set up with chairs, a stage, and two projection screens. Spanish-speaking employees were directed to seats on which translation headsets had been placed. These employees received English-to-Spanish translation services throughout the meeting. Once all employees were seated, the company and the Carpenters each gave a PowerPoint presentation, which was followed by a question-and-answer session. Allegedly, at some point during the meeting, Raymond told the employees they needed to join the Carpenters "that day" if they wanted to continue working.

Following the meeting, employees went outside the training room, where representatives from the Carpenters Union were waiting. The union agents handed the employees materials that included an "Application for Membership" form, a "Supplemental Dues and CLIC Authorization" form, and an "Authorization for Representation" form. Once the employees filled out and returned the forms, they received a copy of the Carpenters' magazine. The magazine explained the employees' rights to decline union membership and to seek a reduction in union fees for monies spent on activities not germane to the union's duties to serve as the employees' agent in collective bargaining ("*Beck* rights"). A majority of the employees filled out and returned the materials that had been distributed.

Later that day, union officials presented Raymond with the signed Authorization for Representation forms, which, according to the union, supported its claim that a majority of the drywall-finishing employees had elected the Carpenters to represent them. Raymond and the Carpenters then executed a "Recognition Agreement," which stated that the company recognized the union as the exclusive collective bargaining representative under Section 9(a) of the Act for all employees

covered by the Memorandum Agreement. There is no dispute that this Recognition Agreement covered Raymond's drywall-finishing employees.

## C. The Proceedings Before the Board

As a result of the above events, the Painters Union filed unfair labor practice charges with the Board. On January 30, 2008, following an investigation, the Board's Regional Director consolidated the charges and issued a complaint, alleging that Raymond and the Carpenters had committed unfair labor practices within the meaning of the Act. A hearing was then held before an ALJ, at which Raymond, the Carpenters, and the Painters participated.

On November 10, 2008, the ALJ issued his findings and recommended order. Regarding the charges related to October 1, 2006, the ALJ found that Raymond and the Carpenters, by applying the 2006 Master Agreement to the drywall-finishing employees, had violated Section 8(a)(1) and (3) and Section 8(b)(2) of the Act, respectively. The ALJ also found that Raymond and the Carpenters violated Section 8(a)(2) and Section 8(b)(1)(A), respectively, when Raymond recognized the Carpenters as the employees' bargaining representative on that day. Regarding the charges related to October 2, 2006, the ALJ found four separate violations of the Act. First, Raymond – by telling employees to join the Carpenters "that day" – unlawfully conditioned employment on immediate union membership, in violation of Section 8(a)(1) and (3). Second, this statement coerced the employees into signing the Authorization for Representation forms, thus rendering assistance to the Carpenters, in violation of Section 8(a)(1) and (2). Third, Raymond and the Carpenters' execution of the Recognition Agreement, when the Carpenters did not have the support of an uncoerced majority of the employees, violated

Section 8(a)(1) and (2) and Section 8(b)(1)(A), respectively. Finally, the Carpenters failed to inform the employees of their *Beck* rights prior to obligating them to pay union dues and fees, in violation of Section 8(b)(1)(A). Raymond, the Carpenters, and the Painters filed exceptions to these findings.

On September 30, 2009, a two-member panel of the Board largely adopted the ALJ's findings and recommended order. *Raymond Interior Sys.*, 354 N.L.R.B. 757 (2009). The Board declined, however, to review the ALJ's findings regarding Raymond and the Carpenters' application of the 2006 Master Agreement to the drywall-finishing employees, and Raymond's recognition of the Carpenters as bargaining representative, on October 1. *Id.* at 757. The Board held:

> Those findings would be cumulative of the findings of unlawful conduct occurring on October 2, and would not materially affect the remedy in this proceeding.

*Id.* The Board nevertheless accepted the ALJ's determination that the application of the 2006 Master Agreement was unlawful because "the parties were applying that same agreement . . . on October 2," which was when the employer and the union committed unfair labor practices. *Id.* at 758 (citing *Duane Reade, Inc.*, 338 N.L.R.B. 943, 944 (2003), *enforced* 99 F. App'x 240 (D.C. Cir. 2004)). As a result, the Board ordered Raymond and the Carpenters to, *inter alia*, "[c]ease and desist from . . . enforcing . . . the [2006 Master Agreement] as to [the] drywall-finishing employees . . . , unless or until [the Carpenters] has been certified by the Board." *Id.* at 758, 759.

Raymond, the Carpenters, and the Painters sought review in the U.S. Court of Appeals for the Ninth Circuit. After the Supreme Court issued its decision in *New Process Steel, L.P.*

*v. NLRB*, 560 U.S. 674 (2010), holding that two-member panels do not have authority to decide Board cases, the Ninth Circuit remanded the case to the Board. *Raymond Interior Sys. v. NLRB*, No. 10-70209 (9th Cir. Aug. 26, 2010). A three-member panel of the Board then adopted the two-member panel's earlier decision. *Raymond Interior Sys.*, 355 N.L.R.B. 1278 (2010). Raymond, the Carpenters, and the Painters then sought review in this court. However, in light of a pending motion for reconsideration before the Board, we dismissed the case as "incurably premature." *Carpenters v. NLRB*, No. 10-1315 (D.C. Cir. May 25, 2012). On December 30, 2011, the Board largely denied the motion for reconsideration. *Raymond Interior Sys.*, 357 N.L.R.B. No. 166 (Dec. 30, 2011). Notably, however, in its decision, the Board clarified that its orders should not be interpreted as requiring a Board certification before Raymond could lawfully recognize the Carpenters pursuant to Section 8(f). *Id.* at 1 n.5. Raymond, the Carpenters, and the Painters then filed petitions for review in this court, and the Board cross-applied for enforcement.

## II. ANALYSIS

### A. The Governing Legal Principles

Under the Act, unions and employers may establish collective bargaining relationships pursuant to Board certification, voluntary recognition, or by execution of an 8(f) agreement. As we recently explained:

> "Under sections 9(a) and 8(a)(5) of the [NLRA], employers are obligated to bargain only with unions that have been 'designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes.'" *Nova Plumbing,*

*Inc. v. NLRB*, 330 F.3d 531, 533 (D.C. Cir. 2003) (quoting 29 U.S.C. § 159(a)); *see also* 29 U.S.C. § 158(a)(5) ("It shall be an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section [9(a)]."); *see also Int'l Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 738-39 (1961). "A union can achieve the status of a majority collective bargaining representative through either Board certification or voluntary recognition by the employer. . . ." *Raymond F. Kravis Ctr. for Performing Arts, Inc. v. NLRB*, 550 F.3d 1183, 1188 (D.C. Cir. 2008).

Section 8(f) of the NLRA, 29 U.S.C. § 158(f), carves out a limited exception to section 9(a)'s majority support requirement within the construction industry. Section 8(f) provides, in pertinent part:

> It shall not be an unfair labor practice . . . for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members . . . because [ ] the majority status of such labor organization has not been established under the provisions of section [ ]9 prior to the making of such agreement . . . .

29 U.S.C. § 158(f). "Under this exception, a contractor may sign a 'pre-hire' agreement with a union regardless of how many employees authorized the union's representation." *Nova Plumbing*, 330 F.3d at 534; *see*

*also Allied Mech. Servs., Inc. v. NLRB*, 668 F.3d 758, 761 (D.C. Cir. 2012). The Congress enacted this limited exception because construction employers must know their labor costs up front in order to generate accurate bids and must have available a supply of skilled craftsmen ready for quick referral. In addition, traditional union organization is not conducive to the brief, project-to-project periods workers spend in the employ of any single contractor.

A union that is party to a section 8(f) agreement serves as the section 9(a) exclusive bargaining representative of the unit it purports to represent for the duration of the section 8(f) agreement. *Viola Indus.-Elevator Div., Inc.*, 286 N.L.R.B. 306, 306 (1987), *enforced* 979 F.2d 1384 (10th Cir. 1992); *John Deklewa & Sons, Inc.*, 282 N.L.R.B. 1375, 1385 (1987) (*Deklewa*), *enforced sub nom. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Local 3 v. NLRB*, 843 F.2d 770 (3d Cir. 1988). But its section 9(a) status is limited in significant respects. A union party to a section 9(a) agreement is entitled to a conclusive presumption of majority status for up to three years, during which time decertification petitions are barred. But under section 8(f), a union is entitled to no such presumption and parties may therefore file decertification petitions at any time during a section 8(f) relationship. Moreover, when a section 9(a) agreement expires, the presumption of majority support requires the employer to continue bargaining with the union unless the union has in fact lost majority support or the employer has a good-faith reason to believe such support has been lost. But "because the union enjoys no presumption that it ever had majority support" under section 8(f), the employer can refuse to

bargain once a section 8(f) agreement expires. *Nova Plumbing*, 330 F.3d at 534.

Even while operative, a section 8(f) agreement is not set in stone. If a union party to an 8(f) agreement successfully seeks majority support, the prehire agreement attains the status of a [section 9(a)] collective-bargaining agreement executed by the employer with a union representing a majority of the employees in the unit. "Generally, a union seeking to convert its section 8(f) relationship to a section 9(a) relationship may either petition for a representation election or demand recognition from the employer by providing proof of majority support." *M & M Backhoe Serv., Inc. v. NLRB*, 469 F.3d 1047, 1050 (D.C. Cir. 2006). But "a vote to reject the signatory union will void the 8(f) agreement and will terminate the 8(f) relationship." *Deklewa*, 282 N.L.R.B. at 1385.

*United Bhd. of Carpenters & Joiners of Am. v. Operative Plasterers' & Cement Masons' Int'l Ass'n of U.S. & Can.*, 721 F.3d 678, 691-93 (D.C. Cir. 2013) (alterations and ellipses in original) (citations omitted).

Employers and unions in lawful collective bargaining relationships may execute collective bargaining agreements that include union-security clauses requiring union "membership" as a condition of employment. 29 U.S.C. § 158(a)(3), (f). However, the "burdens of membership upon which employment may be conditioned are expressly limited to the payment of initiation fees and monthly dues. It is permissible to condition employment upon membership, but membership, insofar as it has significance to employment rights, may in turn be conditioned only upon payment of fees and dues." *Gen. Motors Corp.*, 373 U.S. at 742. Furthermore,

if employees object, a union may not use their monies collected pursuant to a union-security clause for activities unrelated to collective bargaining, contract administration, or grievance adjustment. *Beck*, 487 U.S. at 745. The Board has therefore held that a union must provide employees with a "*Beck* notice" – *i.e.*, notice of the above rights – at or before "the time the union first seeks to obligate . . . employees to pay dues." *Cal. Saw & Knife Works*, 320 N.L.R.B. 224, 233 (1995), *enforced sub nom. Int'l Ass'n of Machinists & Aerospace Workers v. NLRB*, 133 F.3d 1012 (7th Cir. 1998). Failure to do so constitutes a violation of Section 8(b)(1)(A) of the Act. *Id.* at 235.

Any person may file an unfair labor practice charge with the Board. 29 C.F.R. § 102.9. If the allegations appear to have merit, the Regional Director issues a complaint. *Id.* § 102.15. If the Board finds merit in the complaint, it must order the offending parties to cease and desist from the unlawful activity or take affirmative action that will effectuate the policies of the Act. 29 U.S.C. § 160(c). Any person "aggrieved by a final order of the Board granting or denying . . . the relief sought" may obtain review in the court of appeals. *Id.* § 160(f). The Board's findings of fact are conclusive if supported by substantial evidence, *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 366 (1998), and its choice of remedy is reviewed for an abuse of discretion, *Teamsters Local Union No. 639 v. NLRB*, 924 F.2d 1078, 1085 (D.C. Cir. 1991).

## B. The Board's Findings Regarding the Conduct of Raymond and the Carpenters on October 2, 2006

The ALJ found and the Board agreed that Raymond and the Carpenters committed multiple unfair labor practices on October 2, 2006. Raymond and the Carpenters challenge a

number of the Board's findings and the legal conclusions emanating therefrom.

Raymond first challenges the Board's finding that, on October 2, Raymond told the drywall-finishing employees that they had to join the Carpenters "that day." Raymond claims that the evidence simply does not support this finding. We disagree.

The Board accepted the ALJ's credibility determinations in assessing the veracity of witnesses who testified at the unfair labor practice hearing. *Raymond*, 354 N.L.R.B. at 757 n.2. We "will not reverse the Board's adoption of the ALJ's credibility determination unless it is 'hopelessly incredible, self-contradictory, or patently unsupportable.'" *SFO Good-Nite Inn, LLC v. NLRB*, 700 F.3d 1, 10 (D.C. Cir. 2012) (citation omitted). The existence of potential inconsistencies in credited testimony, without more, is not sufficient for the court to overturn an ALJ's credibility finding. *See id.* at 10-11. Furthermore, the "mere fact that conflicting evidence exists is insufficient to render a credibility determination 'patently [u]nsupportable.'" *Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 426 (D.C. Cir. 1996). Rather, only in the "most extraordinary circumstances" will it be appropriate for the court to overturn such a determination. *SFO*, 700 F.3d at 10-11.

In this case, the ALJ afforded significant weight to the testimony of one drywall-finishing employee, Jose Ramos, whose "demeanor, while testifying, was that of a veracious witness." *Raymond*, 354 N.L.R.B. at 778. Not only did Ramos "recount[] [Raymond's] alleged threat to the listening drywall finishers," but he also testified that, "without the immediate prospect of another job, [he did] not . . . report for work the next day." *Id.* at 778-79. To the ALJ, it was "unmistakably

clear" that Ramos believed that the company was "utterly serious" in telling the employees that they had to join the union on October 2. *Id.* at 778. Raymond offers no plausible basis for this court to reject the ALJ's credibility determinations accepting the testimony of Ramos and other witnesses who generally confirmed Ramos's testimony.

Raymond also challenges the Board's finding that the company's statement to the employees gave unlawful assistance to the Carpenters because the statement was intimidating and thus caused the employees to designate the Carpenters as their bargaining agent lest they lose their jobs. Raymond argues that, while its statement telling the employees to join the union "that day" may well have induced employees to sign the "Application for Membership" form, it would not have coerced them to sign the "Authorization for Representation" form. Raymond argues that the employees could differentiate between the two forms, so there is no actual evidence to support the Board's finding. We are not persuaded.

It is not necessary for the Board to point to "evidence of actual intimidation" in support of its finding. *Teamsters Local Union No. 171 v. NLRB*, 863 F.2d 946, 954 (D.C. Cir. 1988). Rather, whether employees have been coerced is assessed by reference to the "totality of the circumstances." *Fountainview Care Ctr.*, 317 N.L.R.B. 1286, 1289 (1995), *enforced* 88 F.3d 1278 (D.C. Cir. 1996). The court is obliged to "recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." *Progressive Elec., Inc. v. NLRB*, 453 F.3d 538, 544 (D.C. Cir. 2006) (citation omitted). And, as the Board has held, "[w]here, as here, an employer imposes certain requirements on its employees, it must bear the burden of any ambiguity in its message." *Acme Tile & Terrazzo Co.*, 318

N.L.R.B. 425, 427-428 & n.8 (1995) (considering whether employer statements conditioned employment on union membership), *enforced* 87 F.3d 558 (1st Cir. 1996).

Here, the ALJ noted that the Application for Membership form and the Authorization for Representation form were printed together on a single document and were distributed to the employees as soon as the meeting ended. *Raymond*, 354 N.L.R.B. at 780. In these circumstances, the Board found that the employees, having just been told to join the Carpenters "that day" if they wanted to keep their jobs, "undoubtedly completed and executed every form on the large document without regard to the differences between them." *Id.* Such a finding is reasonable, and we will not disturb it here. *See Fountainview*, 317 N.L.R.B. at 1289 (authorization forms presented alongside job applications in a single document gave "the impression that there was a link between [union authorization] and the hiring process").

Finally, as noted above, a union must provide employees with a *Beck* notice at or before the time when the employees become obligated to make payments pursuant to a union-security clause. *Cal. Saw & Knife*, 320 N.L.R.B. at 233. Here, there is no dispute that the drywall-finishing employees first received a *Beck* notice when they were given copies of the Carpenters' magazine, which was *after* they had already completed and returned the Carpenters' forms. The Board concluded that the forms "obligat[ed] [the employees] to pay monthly dues." *Raymond*, 354 N.L.R.B. at 781. The question here, then, is whether the Carpenters effectively committed the employees to pay dues without first explaining the legal limits of the union-security provision.

Substantial evidence supports the Board's finding. The Application for Membership form provides for "Monthly dues

in the amount of $\_\_\_\_, per month, commencing immediately," which are "due and payable each month while on application." And the Supplemental Dues and CLIC Authorization form states, "I hereby authorize the Southwest Carpenters Vacation ('Trust') to deduct from my vacation benefits supplemental dues . . . ." From these facts, the Board reasonably concluded that, by filling out and signing the forms, the employees became obligated to pay dues prior to the time that they received a *Beck* notice.

## C. The Board's Failure to Assess the Confidential Settlement Agreement and its Incorporation of the 2006 Master Agreement

As previously explained, Raymond and the Carpenters executed a Confidential Settlement Agreement on September 12, 2006, providing that, upon expiration of the Painters Agreement, Raymond would apply the 2006 Master Agreement to Raymond's drywall-finishing employees "to the fullest extent permitted by law." The Confidential Settlement Agreement took effect on October 1, 2006. The ALJ found that Raymond and the Carpenters had violated Section 8(a)(1) and (3) and Section 8(b)(2) of the Act, respectively, when they applied the 2006 Master Agreement to the drywall-finishing employees on October 1, and had violated Section 8(a)(2) and Section 8(b)(1)(A) of the Act, respectively, when Raymond recognized the Carpenters as the employees' bargaining representative on that day. The Board declined to address the legality of the 2006 Master Agreement as of October 1 because that agreement was the same agreement that was unlawfully enforced on October 2. The Board thus ordered Raymond and the Carpenters to, *inter alia*, cease and desist from applying the 2006 Master Agreement to the drywall-finishing employees unless and until the Carpenters were certified by the Board.

In a motion for reconsideration submitted to the Board, Raymond, joined by the Carpenters, argued:

> The Board's Order is unwarranted if Raymond had a pre-existing 8(f) agreement at the time of the alleged Section 8(a)(2) violations found by the ALJ and adopted by the Board. Extant Board precedent under *Zidell Exploration[s], Inc.*, 175 NLRB 887 (1969) holds that a pre-existing 8(f) agreement is not invalidated by subsequent acts of unlawful assistance.

Motion for Reconsideration, *reprinted in* Joint Appendix 24. In rejecting this claim, the Board said:

> Raymond also argues that the Board erred in failing to decide whether the "Confidential Settlement Agreement" (CSA) reached between Raymond and the Carpenters 3 weeks before the unlawful assistance constituted a valid 8(f) agreement that was not invalidated by Raymond's subsequent acts of unlawful assistance. We deny this aspect of the motion, because a finding that the [Confidential Settlement Agreement] constituted a valid 8(f) agreement would not affect our determination that Raymond, on October 2, 2006, unlawfully recognized the Carpenters as the 9(a) representative of its drywall finishing employees.

*Raymond*, 357 N.L.R.B. No. 166, at 2.

The Board's decision is hard to fathom. As the Board noted, Raymond and the Carpenters contended that the Confidential Settlement Agreement and its incorporation of the 2006 Master Agreement on October 1 resulted in a *lawful* 8(f) agreement covering the drywall-finishing employees on

that date. They further contended that the unfair labor practices that were allegedly committed on October 2 could not have vitiated the lawful 8(f) agreement that was effective on October 1. In other words, Raymond and the Carpenters claim that even if their attempt to execute a 9(a) agreement on October 2 failed, this could not have nullified the preexisting 8(f) agreement. We agree that the Board erred in failing to address this issue.

There is a long-standing principle that, as a general matter, when a collective bargaining agreement is not a byproduct of unfair labor practices and does not otherwise hinder the policies of the Act, "the Board [is] without authority to require [the parties] to desist from giving effect to the [agreement]." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 236-38 (1938); *see also NLRB v. Reliance Steel Prods. Co.*, 322 F.2d 49, 56 (5th Cir. 1963); *NLRB v. Kiekhaefer Corp.*, 292 F.2d 130, 135-37 (7th Cir. 1961); *NLRB v. Scullin Steel Co.*, 161 F.2d 143, 147-48 (8th Cir. 1947). Indeed, the Board applied this principle in *Zidell Explorations, Inc.*, 175 N.L.R.B. 887 (1969), the decision cited by Raymond in its Motion for Reconsideration.

In *Zidell*, after executing lawful 8(f) agreements with a union, the employers involved in that case engaged in unfair labor practices. The ALJ concluded that the 8(f) agreements were "rendered unlawful *nunc pro tunc* by reason of the postcontract employer unfair labor practices." *Id.* at 887-88. The Board rejected this conclusion and explained:

> [I]t has long been established by Board and court cases that employer acts of unlawful assistance occurring after the execution of a lawful contract, and during the contract term, do not justify a remedial order suspending

recognition of the assisted union during the contract term or directing that the contract be set aside.

*Id.* at 888 (citing *Reliance Steel Prods.*, 322 F.2d 49; *Scullin Steel*, 161 F.2d 143; *Arden Furniture Indus.*, 164 N.L.R.B. 1163 (1967); *M. Eskin & Son*, 135 N.L.R.B. 666 (1962), *enforced sub nom. Confectionery & Tobacco Drivers & Warehousemen's Union, Local 805 v. NLRB*, 312 F.2d 108 (2d Cir. 1963); and *Lykes Bros., Inc.*, 128 N.L.R.B. 606 (1960)). The Board never addressed this line of authority in its decision in this case.

Before this court, Board counsel argued that *Zidell* is inapposite because it is factually distinguishable. Counsel pointed out that, "[i]n *Zidell*, unlike here, the 'employer alone' was responsible for the unlawful conduct that occurred subsequent to the creation of a Section 8(f) contract." Br. for Respondent at 49. Thus, according to counsel, *Zidell* should be limited to situations in which the unlawfully assisted union was not "found to have participated in, had any control over, or even been aware of [the unlawful] conduct." *Id.* (alteration in original) (citation omitted). We decline to consider this argument because it is merely a *post-hoc* rationalization offered by Board counsel, not the Board. The Board never addressed *Zidell* in denying the Motion for Reconsideration filed by Raymond. Furthermore, even if we were to consider this argument, the authorities cited by *Zidell* certainly do not endorse the limitation suggested by Board counsel. *See Zidell*, 175 N.L.R.B. at 888 n.2.

In *M. Eskin & Son*, both the employer and the union committed unfair labor practices after executing a lawful agreement. 135 N.L.R.B. at 666, 670. Nevertheless, the Board there refused to invalidate the preexisting contract, explaining:

As all the unfair labor practices . . . occurred during the term of the Respondents' collective bargaining contract, the execution and maintenance of which are not under attack, we do not believe that an order requiring the parties to suspend their bargaining relationship pending an election is necessary to effectuate the policies of the Act. Accordingly, as there is no basis for a finding that the contract between the parties was a consequence of the unfair labor practices found, or that the contract thwarts any policy of the Act, we reject the [ALJ's] recommendation for the issuance of a cease-recognition order.

*Id.* at 671 (footnote omitted) (citing *Scullin Steel*, 161 F.2d at 147); *see also Lykes Bros.*, 128 N.L.R.B. at 609-11 (same). There is nothing in the *Zidell* decision to indicate that the Board meant to disavow the holdings in *M. Eskin & Son* or *Lykes Brothers*, nor is there anything to suggest the Board meant to disregard or limit the principle endorsed in *Consolidated Edison Co.* and its progeny.

If, as they contend, Raymond and the Carpenters executed a lawful 8(f) agreement on October 1, then their subsequent unfair labor practices that were committed when they attempted to execute a 9(a) agreement on October 2 would appear to be irrelevant to the question of whether there was a lawful 8(f) agreement in effect on October 1. Even if, as the Board found, Raymond unlawfully recognized the Carpenters on October 2, 2006, as the 9(a) representative of its drywall-finishing employees, why would this nullify a lawful, pre-existing 8(f) agreement? The Board inexcusably failed to address this issue. We will therefore remand the case for further consideration.

**D.  The Petition for Review Filed by the Painters Union**

The Painters Union has petitioned for review for the limited purpose of challenging the Board's sanctions against Raymond and the Carpenters Union. In particular, the Painters Union contends that the Board abused its discretion in declining to require Raymond to provide alternate benefits coverage equivalent to the coverage possessed under the 2006 Master Agreement, choosing instead to allow Raymond to maintain the benefits already in place. *See Raymond*, 357 N.L.R.B. No. 166, at 1. The Painters Union also contends that the Board erred in not precluding Raymond and the Carpenters from entering an 8(f) agreement in the future. *See id.* at 1 n.5.

In assessing the Painters' claims, we want to make it clear that nothing in our decision is meant to question the Board's determination that Raymond and the Carpenters were free to enter into an 8(f) arrangement after October 2. The Board did not err in reaching this conclusion and it need not reconsider this matter on remand.

We decline to consider the Painters' principal claim – *i.e.*, that the Board abused its discretion in declining to require Raymond to provide alternate benefits coverage – because our decision to remand on the remedy issue may render the claim moot. *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1528 (2013) ("If an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during litigation, the action can no longer proceed and must be dismissed as moot." (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477–78 (1990))). If the Board concludes on remand that Raymond and the Carpenters entered into a valid section 8(f) agreement on October 1 that endured despite the subsequent unfair labor

practices, the Painters Union can raise no viable challenge to the Board's decision to allow Raymond to maintain the benefits in place since the entire agreement would remain in place. If the Board finds that Raymond and the Carpenters did not enter into a valid section 8(f) agreement on October 1, then it will be up to the Board in the first instance to determine whether any adjustment in its remedial order is required.

### III. CONCLUSION

Consistent with the opinion above, we grant in part and deny in part the Board's cross-application for enforcement. We also deny in part and grant in part the petitions for review filed by Raymond and the Carpenters Union. We remand the case to the Board for further consideration consistent with this decision.

*So ordered*.